UNITED STATES ET AL. *v.* CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY.

No. 10.  Argued April 24, 25, 1930.  Reargued November 25, 1930.—Decided January 5, 1931.

312

*Assistant to the Attorney General* O'Brian, with whom *Attorney General Mitchell, Messrs. Claude R. Branch* and *Charles H. Weston,* Special Assistants to the Attorney General, and *Daniel W. Knowlton,* Chief Counsel Interstate Commerce Commission, were on the brief, for the United States et al.

314

316

*Mr. John W. Davis,* with whom *Messrs. H. H. Field, O. W. Dynes, Robert T. Swaine,* and *Frederick H. Wood* were on the brief, for appellee.

318

·Mr. Justice Sutherland delivered the opinion of the Court.

In 1925 the Chicago, Milwaukee and St. Paul Railway Company, a·Wisconsin corporation, became insolvent and

passed into the hands of receivers appointed by the federal district court for the northern district of Illinois and subsequently by other federal district courts. Thereupon, and pending a decree of foreclosure of outstanding mortgages, committees were formed by and for the various classes of security holders for the purpose of protecting their several interests in the receivership proceedings and in the ultimate disposition of the railway property. Reorganization managers were appointed by the committees for the purpose of preparing and submitting a plan of reorganization. Thereafter, a plan was submitted to, and adopted and approved by, the committees, with an exception not material here, and after some modification was approved by the court below. There was a final decree of foreclosure under which the properties of the Railway company, in November, 1926, were sold, subject to certain existing liens, to persons acting as agents for the managers and for the benefit of the security holders. This sale was confirmed and the plan held valid by the court, with a proviso that conveyances should not be delivered to appellee, the new company formed in pursuance of the reorganization plan, until after the Interstate Commerce Commission, pursuant to law, had authorized such company to issue the securities provided for in the plan.

The reorganization plan provided that the stockholders of the old company who accepted the plan might participate in the reorganization by depositing their common and preferred stock, together with the sum of $32 for each share of the former and $28 for each share of the latter. Each depositor was thereupon to receive in exchange common and preferred stock in the new company, and in addition $28 and $24, respectively, in five per cent bonds of the new company. Out of the remainder of the money deposited, being $4 per share of the old stock, an amount equivalent to $1.50 per share was separated from the remaining $2.50 of the $4 fund and " set aside to provide for the compensation of the reorganization managers

and the committees . . . and the fees and disbursements of their counsel and all depositaries and sub-depositaries, any balance of said sum to be paid over to the new company as additional working capital or, if the reorganization managers in their discretion shall so determine, to be returned *pro rata* to the holders of certificates of deposit for stock." The discretion so to be exercised by the managers was declared to be absolute and uncontrolled. The amount to be paid as compensation to the managers was definitely fixed by agreement contained in the plan and compensation for the services of the committees was to be fixed by the managers unless the plan should be abandoned, in which event none was to receive any compensation. Payment to other persons for services was to be made whether the plan should be carried through or abandoned. In respect of the remainder of the $4 fund, namely $2.50 per share, the effect of the plan was to require that after satisfying such expenses as costs of foreclosure, court allowances, engraving of securities for the new company, charges of corporate trustees, etc., any balance remaining should be paid over to the new company.

An application was made to the commission for a certificate of public convenience and necessity under the appropriate provisions of the Transportation Act, 1920, and for an order under § 20a of that act (c. 91, § 439, 41 Stat. 494; U. S. C., Tit. 49, § 20a) authorizing and approving the issue of securities in accordance with the reorganization plan. Section 20a of the act among other things provides:

"(2) . . . It shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed 'securities') or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even

though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the Commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the Commission by order authorizes such issue or assumption. The Commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose.

"(3) The Commission shall have power by its order to grant or deny the application as made, or to grant it in part and deny it in part, or to grant it with such modifications and upon such terms and conditions as the Commission may deem necessary or appropriate in the premises, and may from time to time, for good cause shown, make such supplemental orders in the premises as it may deem necessary or appropriate, and may by any such supplemental order modify the provisions of any previous order as to the particular purposes, uses, and extent to which, or the conditions under which, any securities so theretofore authorized or the proceeds thereof may be applied, subject always to the requirements of the foregoing paragraph (2).

\*  \*  \*  \*  \*

"(11) Any security issued or any obligation or liability assumed by a carrier, for which under the provisions of this section the authorization of the Commission is re-

quired, shall be void, if issued or assumed without such authorization therefor having first been obtained, or if issued or assumed contrary to any term or condition of such order of authorization as modified by any order supplemental thereto entered prior to such issuance or assumption; . . ."

The commission, after a hearing, certified that public convenience and necessity required the acquisition and operation by the new company of the lines of railroad theretofore owned by the Chicago, Milwaukee and St. Paul Railway Company, and entered an order that the new company be authorized to issue the securities which were described in the report and order of the commission, " Provided, however, . . . that the applicant . . . (b) shall impound in a separate fund the money received from the payment by holders of preferred and common stock in an amount equal to $4 a share, which shall not be paid out unless and until so authorized by order of the court in respect to payments subject to the court's jurisdiction or by this commission."

The present suit was brought to have the foregoing clause (b) of the proviso declared beyond the lawful authority of the commission and void, and perpetually to enjoin appellants from enforcing the order of the commission in that respect. In addition to the facts hereinbefore set forth, and others, it was alleged in the petition that the commission and the United States had threatened to institute criminal or civil proceedings against appellee, in accordance with applicable provisions of the Interstate Commerce Act, for violation of the condition imposed by clause (b) of the proviso. Appellants answered separately, admitting all the material allegations of the petition pertinent to the question now under review; and separately moved to dismiss the petition on the ground that the court was without jurisdiction to set aside that part of the order which was assailed. After

argument the court below entered a decree denying the motions to dismiss and perpetually setting aside, suspending and annulling, and perpetually enjoining the enforcement of, or attempt to enforce, the condition (b) imposed by the proviso, so far as it here is in question; that is to say, such part thereof as required appellee to obtain the special fund of $1.50 per share and impound the same, and which prohibited the making of any payment out of that fund without a prior determination by the commission in respect thereof.

The court below was of opinion that the proviso should be so construed as to include only the $2.50 part of the fund and exclude the special fund of $1.50 per share from its operation; otherwise that the condition in respect of the latter was void. The court further held that the case made by the petition was within the jurisdiction transferred to the district courts from the Commerce Court by c. 32, 38 Stat. 219, namely, jurisdiction over "Cases brought to enjoin, set aside, annul, or suspend in whole or in part any order of the Interstate Commerce Commission." c. 309, 36 Stat. 539. 33 F. (2d) 582.

We do not stop to discuss the holding of the court below in respect of the construction of the proviso further than to say that, contrary to the view of that court though plausibly stated, we have reached the conclusion that the terms of the proviso embrace, and were meant to embrace, the entire fund of $4 per share, including the special fund of $1.50. Thus construed, two questions remain for consideration: (1) Was it within the power of the commission to impose the condition so far as it included the special fund? (2) Was that condition such a *part* of the commission's order as to cause it to fall within the jurisdiction conferred by the language last quoted above?

*First.* The legality of the acquisition and operation by the new company of the lines of railroad theretofore owned by the old company is not now in question. The

requisite certificate of public convenience and necessity was issued by the commission. The order of the commission authorizing the new company to issue securities was made after a finding of all the facts required by the act as a necessary basis therefor. By subdivision (3) of § 20a the commission is empowered to make its grant of authority to issue securities upon such conditions as the commission may deem necessary or appropriate in the premises. The power to impose such conditions, however, is not unlimited and may not be exercised arbitrarily or (since Congress cannot delegate any part of its legislative power except under the limitation of a prescribed standard, *Union Bridge Co.* v. *United States,* 204 U. S. 364, 384–385) unless there be found substantial warrant for the conditions in the applicable standards established by the provisions of the act relating to such securities. The powers possessed by the commission are delegated by Congress under, and are to be exercised in conformity with, the constitutional grant of authority to regulate interstate and foreign commerce. Proceeding under that grant, as applied to the present matter, neither the commission nor Congress itself may take any action which lies outside the realm of interstate commerce. *Hammer* v. *Dagenhart,* 247 U. S. 251. It follows that if the condition in question relates not to such commerce, or to the rights or duties of the carrier engaged in such commerce, but exclusively to extrinsic matters, it is imposed without authority of law.

In the light of the foregoing, we examine the provision of the reorganization plan in respect of the special fund of $1.50 per share. That provision embodies a contract between the committees (voluntarily created by private persons), the managers, and such stockholders as shall elect to become depositors under the plan and shall advance, with other monies for other purposes, the specified sum for the distinct and sole purpose of paying the man-

agers and others for services rendered in behalf of and for the exclusive benefit of these depositors. Neither the old company nor the new one was a party or was privy to this contract. Neither the contract when made nor any of the parties to it, in respect of the contract, was subject to the jurisdiction of the commission. It was not contemplated by any of the parties, by the new company, or by the court which held the plan to be valid, that the new company should have any enforceable interest in this special fund. Indeed, by contract between the new company, the managers and the purchasers at the sale, it was expressly agreed that the remainder of all cash received by the managers under the reorganization plan should be paid over to the new company, *except the special fund of $1.50 per share of the old company's stock,* " which, as provided in the reorganization plan, is to be set aside to provide for the compensation of the managers and the committees, fixed as therein provided, and the fees and disbursements of their counsel and of all depositaries and subdepositaries." And, correlatively, the new company agreed to pay all other expenses incurred by the managers except such as were to be paid out of this special fund. These agreements of the interested parties lend emphasis to the conclusion that the services to be rendered and expenses to be incurred in formulating and bringing about an approval of the plan were to be paid for out of the special fund as matters in which the private parties alone were concerned.

If the security holders, instead of agreeing to the provision for a special fund incorporated in the body of the reorganization plan, had bound themselves by a separate contract to compensate the managers and others for their services in behalf of the security holders, and had placed a sum of money in the hands of a trustee to secure payment of the estimated amount, as they well might have done, it probably would not have been contended that the

commission lawfully could impose upon the issue of the securities the condition that the new company should take control of this money or that it should be paid out under the direction of the commission. But in principle how does the case under review differ from the case supposed? The agreement in respect of the special fund, though contained in the body of the plan, is in effect as distinct as though it had been made by separate contract. It seems plain enough that the commission, by the condition here in question, has undertaken to lay its hands upon and control the disposition of a fund created by contract between private persons to which the carrier was not a party, in which the carrier had no enforceable interest, and which was not within the purview of the regulating power of the commission. The most that can be said is that the creation of the special fund—like production or manufacture of commodities, *United States* v. *E. C. Knight Co.,* 156 U. S. 1, 12—" may [or may not] result in bringing the operation of commerce into play." The contract was not one in respect of commerce but involved a transaction distinct and complete in itself without regard to its results; and, whether succeeded by commerce or not, was no part of it. *Diamond Glue Co.* v. *United States Glue Co.,* 187 U. S. 611, 616.

The proviso itself aptly illustrates by contrast the extent of the commission's power to impose conditions in respect of the matter under review. From the entire fund of $4 per share, $2.50 per share was set apart to be used for paying costs of foreclosure, court allowances, etc., and any balance remaining was to be paid over to the new company; and by a subsequent agreement this balance, together with an unexpended amount intended for expenses not yet liquidated, was formally conceded to be the property of the new company. This portion of the fund, therefore, was properly a part of the carrier's resources; constituted a subject matter upon which the

legislative standards controlling the action of the commission in respect of the issue of securities had a direct bearing; was proximately related to, and might substantially affect, the commercial activities of the carrier; and, accordingly, was a subject in respect of which the condition properly could be imposed by the commission. In the case of the special fund of $1.50 per share, however, the carrier had no such interest. That fund was owned by and subject to the sole control of private persons. Whether the carrier would receive any part of it in the future was a matter of speculation being wholly dependent upon the unrestricted will of its custodians. It results that the condition, in so far as it affects the special fund of $1.50 per share, was an interference with private property and rights lying outside the field of federal jurisdiction.

The power to regulate commerce is not absolute, but is subject to the limitations and guarantees of the Constitution, among which are those providing that private property shall not be taken for public use without just compensation and that no person shall be deprived of life, liberty or property without due process of law. *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 336; *United States* v. *Joint Traffic Association,* 171 U. S. 505, 571–572; *Adair* v. *United States,* 208 U. S. 161, 180. Both the liberty of contract and the right to property here are involved. The contract was valid and had been so adjudged by the court having jurisdiction of the foreclosure and sale. The parties to it were willing and were entitled to have the contract executed according to its terms. There is no power in any department of the government to order otherwise. And certainly a carrier whose only interest in the property lies in the speculative possibility that some remnant of it in the future may come to the carrier as a *gift* is in no position to take it as of *right* without compensation. In that view, any legis-

lative or administrative edict which purports to empower the carrier to take the property without compensation and dispose of it, not as the contract provides, but as the governmental body may direct, must fail as a futile attempt to accomplish what the Constitution does not permit.

*Second.* The jurisdiction of the federal district courts, as already pointed out, extends over cases brought to enjoin, set aside, annul, or suspend, in whole or *in part,* any order of the commission. The contention of the government is that the authority to enjoin an order in part, applies to a severable part of the order, but not to a condition upon which the order was issued after the carrier has exercised the authority granted by the order. No pertinent authority is cited in support of this contention, and none has been called to our attention. A condition contained in the order by which the grant is limited is as much a part of the order as any of its substantive provisions, and if beyond the jurisdiction of the commission is not ratified by an acceptance of the valid part of the order. It long has been settled in this court that the rejection of an unconstitutional condition imposed by a state upon the grant of a privilege, even though the state possess the unqualified power to withhold the grant altogether, does not annul the grant. The grantee may ignore or enjoin the enforcement of the condition without thereby losing the grant. There are many decisions to this effect; but we need cite only *Frost Trucking Co.* v. *Railroad Commission,* 271 U. S. 583, 593–599, and *Hanover Ins. Co.* v. *Harding,* 272 U. S. 494, 507–508, where the cases are collected and reviewed. The decisions rest upon a principle, which " is broader than the applications thus far made of it," *Frost Trucking Co.* v. *Railroad Commission, supra,* at p. 598. Broadly stated, the rule is that the right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a con-

dition prescribed by the state which is hostile to the provisions of the federal Constitution. *Western Union Tel. Co.* v. *Kansas,* 216 U. S. 1, 47–48; *Western Union Tel. Co.* v. *Foster,* 247 U. S. 105, 114.

Without attempting to determine how far this principle may be carried in its application to orders of the Interstate Commerce Commission, or attempting to formulate any general rule in respect thereof, we are of opinion that the principle does apply to the order now under review; and for present purposes that is enough.

An examination of the report shows that the commission first considered the question in respect of the authority to issue securities sought by the new company. As to that matter it found specifically all the facts required by § 20a as prerequisites to an order granting such authority. The commission further found that the value of the properties sought to be acquired, which included no part of the $4 fund, exceeded the amount of the securities, including preferred stock, to be issued or assumed, by more than $70,000,000.*   In determining the value of

---

* The finding in detail is as follows:

"In the instant case the testimony is that the value of the properties proposed to be acquired ranges from $640,000,000 to $900,000,000. For purposes of argument, the Jameson committee took $700,000,000. The book value on May 31, 1927, in round numbers was $707,000,000. Against these values or this investment there will be outstanding after the proposed reorganization the following: Undisturbed bonds, excluding $22,129,000 of bonds assumed pursuant to the lease of Terre Haute, $160,001,960; 50-year 5 per cent mortgage gold bonds, $106,395,096; adjustment-mortgage bonds $182,873,693; preferred stock $119,845,800; total $569,116,549. Using the lowest figure, $640,000,000, and deducting from that amount the total par value of the securities enumerated, or approximately $569,100,000, would leave $70,900,000 as representing the value of the 1,174,060 shares of common stock without nominal or par value. In the hypothetical balance sheet as of May 31, 1927, the applicant shows $174,342,841.64 for the book value of the common stock. Without expressing any opinion as to the value of the no-par-value

the properties as a basis for the issue of the securities, the commission gave no consideration to the $4 fund, or to the amount of any balance which might remain after payment of the charges against it, upon the theory that it constituted any part of these properties. After a comprehensive review of the reorganization plan, the commission concluded: " Upon consideration of all the facts we are of opinion that the public interest will be served by an approval of the application, even though we should believe that a stronger financial structure might have been erected by the adoption of some other plan of reorganization."

The commission, having thus disposed of the application for authority to issue securities, turned to a consideration of the $4 fund and announced that the authority granted to issue the securities would be upon the condition set forth in clause (b) of the proviso. But nowhere in the report do we find the slightest suggestion that any part of the fund was included with the properties which were held to be a sufficient basis for the issue of the securities, together with the proposed non-par-value common stock. The fund was dealt with as an independent and separate matter upon the theory that the commission could reserve jurisdiction over it " for the purpose of taking further testimony as to the expenses of the reorganization, the nature and scope of the services performed for the compensation and fees claimed, and any other matters appropriate in the premises, and for the entering of pertinent orders in connection therewith." That it was not regarded as involving the basic ground for granting the authority is borne out by the concurring opinion of

common stock, it would appear that upon applying the test suggested there will remain an unmortgaged equity in the properties sufficient to permit the bondholders to assign to the stockholders an interest therein and to support the issue of stock in the amounts proposed."

Commissioner Hall, who evidently so understood. He said, "I am in accord with the conclusions authorizing issuance and assumption of liability in respect of securities and granting certificate of public convenience and necessity. I do not conceive that as a commission we have anything to do with the application which may be made of the $4 per share paid in to the reorganization managers by existing stockholders. What those stockholders do with their money is their affair unless and until some part of that money is paid over to the applicant."

The order in itself, being complete and self-sustaining and resting upon grounds found to be sufficient to support it, cannot be made to depend upon submission to a collateral condition, which, as we have shown, is beyond the statutory and constitutional power of the commission to impose. Whatever may be the general rule, we have no difficulty in concluding that, under the circumstances above recited, the principle in respect of the separability of unconstitutional conditions imposed upon a privilege granted by a state is applicable to the present order of the commission—and for a stronger reason, since that body, unlike a state in the class of cases referred to, does not possess the power arbitrarily to deny the authority here sought by the carrier.

From the foregoing it results that the condition in respect of the special fund of $1.50 per share was properly set aside and its enforcement enjoined by the court below.

*Decree affirmed.*

The CHIEF JUSTICE took no part in the consideration or decision of this case.

Opinion of MR. JUSTICE STONE.

I think the judgment should be reversed and the order of the Interstate Commerce Commission upheld as one within its statutory authority. But even if it be assumed

that the condition attached to the order was an improper one, it would seem that the respondent is now estopped to challenge it. In any case, I think the Court should not permit the order to stand as an unqualified approval of the proposed issue of securities, after striking from it the condition upon which the Commission's, approval was given.

1. The obvious purpose of subsection (2) of § 20 (a) of the Transportation Act is the prevention of any issue of securities by a rail carrier unless the Interstate Commerce Commission, " after investigation . . . of the purposes and uses of the proposed issue and the proceeds thereof, . . . finds that such issue . . . is . . . compatible with the public interest, . . , and . . . reasonably necessary and appropriate " for the corporate purposes of the carrier. I suppose no one would doubt, and the opinion of the Court seems to concede, that if the assessments which, under the reorganization plan, were to be levied upon the stockholders of the old company, were all to be paid into the new one in exchange for the new securities, it would have been the duty of the Commission to investigate the purposes and uses of the new issue and its proceeds; and if it found that the issue to raise a fund for the payment of extravagant reorganization expenses was not compatible with the public interest, or reasonably necessary and appropriate for the corporate purposes of the new company, the Commission could have refused to approve it. Under subsection (3)[1] the Commission could have provided against improper expenditures by annexing to its order the very condition which it added in the present case.

---

[1] (3) " The commission shall have power by its order to grant or deny the application as made, or to grant it in part and deny it in part, or to grant it with such modifications and upon such terms and conditions as the commission may deem necessary or appropriate. . . . "

But it is said that, because no part of the $1.50 fund provided by the stockholders to pay for the reorganization would necessarily ever come into the possession or control of the new company, and since its disposition was a mere matter of private contract between the stockholders and the reorganization managers, the condition was beyond the power of the Commission. The question is thus presented, whether the salutary provisions of § 20 (a) can be avoided, and an issue of securities, so far as it is made to raise a fund to defray excessive reorganization expenses, withdrawn from the control of the Commission, by the simple expedient of so arranging the reorganization plan that reorganization managers may retain and disburse, from the moneys paid in by the old stockholders to procure stock in the reorganized company, such amounts as may be required for reorganization expenses.

The history of the receivership resulting in the present reorganization will be found in the report of the Commission in the *Chicago, Milwaukee & St. Paul Investigation*, 131 I. C. C. 615, issued the same day as its report in the present case. The old company having reached the end of its financial rope, and protective committees representing respectively the bondholders, the preferred, and the common stockholders having been organized, its bankers, the present reorganization managers, were active in bringing about the receivership and have since dominated the reorganization. The Commission said (pp. 667, 668):

"For months prior to the receivership they [the railroad's directors] were impotent. It was an ideal situation for the bankers to control. This they promptly did, arranged all the details, framed up the committees favorably to themselves, put themselves on the bondholders' protective committee and constituted themselves reorganization managers."

As managers they formulated the reorganization plan, and incorporated it in an agreement between themselves

and the committees. In every practical sense the reorganization managers controlled the foreclosure proceedings resulting in the sale of the property of the old company. Their representatives were the purchasers at the foreclosure sale. They created and controlled the new company, which is the appellee here. The reorganization plan gave them full power to modify it as a whole or in detail, with the approval of the committee representing the securities affected. They were authorized to carry out the plan; and in doing so they were empowered to act for, and as intermediaries between, the committees, the stockholders, and the new company. Both preferred and common stockholders of the old company were required by the plan to surrender their stock in that company, and to pay $32 for each share of their common stock, and $28 for each of their preferred, in order to procure the securities of the new company. The alternative was loss of their rights as stockholders, which were still of substantial value. The plan called for the use of these sums to pay certain obligations of the old company, and such miscellaneous fiscal requirements of the new as were not supplied by the proceeds of its funded debt, and to create the $1.50 fund, from which were to be paid, in the uncontrolled discretion of the managers, the reorganization expenses incurred in launching the new company and securing the transfer to it of the business and property of the old.

It would seem that technical distinctions between possible methods of procuring payment of the last from funds raised by a security issue of the new company ought not to affect the authority of the Commission. I should have thought that, under our decisions, the Commission, where its order controls only the action of the appellee, might look through legal forms and, disregarding the corporate entity of appellee, treat the action of the reorganization managers, in dealing with the sums paid by the stockholders for the new stock of appellee, as that of their

creature and *alter ego,* the appellee. See *United Fuel Gas Co.* v. *Railroad Commission of Kentucky,* 278 U. S. 300, 308; *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Minneapolis Civic Assn.,* 247 U. S. 490; *United States* v. *Delaware, Lackawanna & Western R. R. Co.* 238 U. S. 516; *United States* v. *Lehigh Valley R. R. Co.,* 220 U. S. 257.

But even if we disregard this identity of interest, and whatever the form of the transaction, whether the reorganization expenses were to be paid out by the new company directly, or merely for its account by the reorganization managers, its creators, in order to enable it to acquire the railroad property for the benefit of its stockholders. the source of the expense fund was the assessments paid by the old stockholders, in reality and legal effect part consideration for, and proceeds of, the issue of the new stock. To say that so much of the reorganization agreement as related to the creation and expenditure of the $1.50 fund for the payment of these expenses was a mere private agreement, unrelated to the issue of securities, with which the Commission is vitally concerned, is to ignore its plain terms and disregard its practical operation.

The first installment of the assessments was not to be paid in by the stockholders until the plan under which the new securities were to be issued was declared operative by the managers. Stockholders who failed to pay the installments in full could acquire no rights to securities in the new company. It cannot be supposed that one dollar of the $1.50 fund would ever have been contributed by stockholders, had not the reorganization agreement definitely undertaken to issue the securities under the plan to those stockholders who deposited their stock and made the required payments. The creation of this fund for the payment of the reorganization and other expenses was a part of the necessary price exacted for the new securities. It was an important purpose for which the new stock was issued, and one of the purposes which the

Commission was directed by the statute to investigate in determining, as it was bound to do,[2] whether the issue was in the public interest and reasonably necessary and appropriate for the corporate purposes of appellee. The considerations affecting the judgment of the Commission in passing upon the reasonable necessity for the issue, its effect upon the public interest and upon the carrier's performance of its public service, are the same whether the expense fund was to be paid directly to the new company for disbursement by it, or short circuited, through the managers, from stockholders of the old to the various claimants for services rendered in creating the new.

Neither the public interest nor the duty imposed on the Interstate Commerce Commission is limited to insuring the payment of debts by any particular railroad, or procuring for it an adequate amount of money or property for the securities which it issues. An important purpose of the Transportation Act of 1920 was to preserve for the nation the transportation system as a whole, and, to that end, to secure a fair return on capital devoted to the transportation service. See *New England Divisions Case*, 261 U. S. 184, 189; *Railroad Commission* v. *C., B. & Q.*

---

[2] The Transportation Act of 1920, § 20a, provides (subsection 2): ". . . it shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier . . . unless and until, and then only to the extent that, upon application by the carrier; and after investigation by the commission of the purposes and uses of the proposed issue and the proceeds thereof, . . . the commission by order authorizes such issue . . . The commissoin shall make such order only if it finds that such issue . . . (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose."

*R. Co.*, 257 U. S. 563, 585; *Dayton-Goose Creek Ry. Co.* v. *United States*, 263 U. S. 456, 478. The preservation of the transportation system and the stability of its credit essential to its preservation depend not alone upon the ability of individual carriers to meet their obligations, but upon the ability of all to attract the investment of funds in their securities. If such investments are impaired by receiverships of the carriers, followed by reorganizations of excessive cost, and if railroad shareholders, compelled by the necessities of their situation, must contribute to the rehabilitation of their properties excessive amounts upon which the reorganized carrier may not earn an adequate return, railroad credit in a broad sense is affected, the permanency and stability of the transportation system as a whole is impaired, and the public interest suffers. No one familiar with the financial and corporate history of this country could say, I think, that railroad credit and the marketability of railroad securities have not been profoundly affected, for long periods of time, if not continuously, by the numerous railroad reorganizations, in the course of which junior security holders have found it impossible to save more than a remnant of their investment, and that only by the assumption of a heavy burden of expense, too often the result of wasteful and extravagant methods of reorganization.

The public likewise has an interest in the costs of reorganization insofar as they may affect rates and the application of the recapture provision of the Transportation Act. Such costs may play an important part in the going concern value of the new company, which is an element of value for rate making purposes. See *Des Moines Gas Co.* v. *Des Moines*, 238 U. S. 153, 165; *Denver* v. *Denver Union Water Co.*, 246 U. S. 178, 184, 192; *Bluefield Co.* v. *Pub. Serv. Comm.*, 262 U. S. 679, 686; *McCardle* v. *Indianapolis Water Co.*, 272 U. S. 400, 414. In *United*

*Railways* v. *West*, 280 U. S. 234, a substantial amount was included in the rate base to cover " Cost of Financing." The mere fact that going concern value is supplied from sources other than the treasury of the carrier, here the stockholders of the old company who became stockholders of the new, is not material. See *United Railways* v. *West, supra.* The Commission is specially charged with public duties with respect to rates, valuation, and the administration of the recapture provisions. In all these respects the public interest may be adversely affected if railroad securities may be issued to effect, either directly or indirectly, the payment of excessive costs of reorganization.

If example were needed of the nature and extent of the public interest which may be involved, it is afforded by the present case. In passing upon the present issue of securities, the Commission had before it the results of its elaborate *Investigation of the Chicago, Milwaukee & St. Paul Ry. Co., supra,* entered into after the receivership, in the course of which it commented on the excessive fees and commissions paid in the past by the Railway Company to its bankers, the present reorganization managers. It had before it tentative estimates of the total cost of reorganization running as high as $6,494,900. The $4 fund set apart for expenses approximated $9,330,000, of which the $1.50 fund was a part aggregating about $3,500,-000, out of which were to be paid the reorganization managers, various protective committees, counsel, and depositaries. The estimated expenses to be paid from this fund ranged from $2,636,000 to $3,381,000, of which the compensation to be paid to the reorganization managers was $1,044,000.

These estimates were eighteen months old at the time the Commission made its report. The Commission concluded that the record was insufficient to enable it to arrive at an opinion as to the reasonableness of these expenses. It reserved jurisdiction to take testimony and

to make further inquiry as to the expenses of reorganization, and the nature and scope of the services performed for the compensation fees claimed; but in order that the reorganization might proceed and the railroad property be released from the receivership, the authority for the issue of the new securities was granted upon the condition that the appellee impound the entire $4 fund, which was to be paid out only upon order of court or the Commission.

Since the Commission had concluded that the expenses might be excessive and that there was no adequate safeguard against improper payments, it could, under the express terms of the statute,[3] have rejected the application. But it is said that even though the Commission might rightly have refused its permission to issue the securities, still, having granted permission, it could not annex this condition to the order; and that, as it could not compel the reorganization managers to impound the expense fund paid over to them, or to submit the reasonableness of the expenses which they had incurred to the Commission or the court, it was an arbitrary and unwarranted exercise of power to make the Commission's approval of the stock issue conditional upon such action.

If that were a valid argument, it would follow that the Commission, notwithstanding the authority given it by subsection (3), could never attach any condition to its approval of an issue of securities, when compliance with the condition would involve the performance of acts which the Commission could not command. But the only purpose of subsection (3) would seem to be to enable the Commission to induce, not compel, action, by annexing to its order, as the statute authorizes, " such terms and conditions as the Commission may deem necessary or appropriate." Notwithstanding this broad language, it may be assumed that only those conditions which, like the present, are germane to the purposes of subsection (2) are

---

[3] See statute, *supra*, note 2.

intended; and that, consequently, only such terms and conditions may be annexed to the order as tend in some measure to remove objections to the issue, which legitimately might be the basis of withholding favorable action.

If the Commission, as I think it might, could have refused to approve the present issue of securities on the ground that they were to be issued to procure payment of reorganization expenses which were or might be excessive, then, plainly, under the provisions of subsection (3) and within the purview of subsection (2), it could have made its consent to the issue conditional upon the modification of the plan, in such manner as to preclude the payment of unreasonable expenses. Appellee was not obliged to comply with the condition, since it was not compelled to proceed with the plan, although compliance with it, through the exercise of the power of the managers to modify the plan, would not, so far as appears, have been impossible or even difficult. But as the condition was one which the Commission had power to impose, appellee, having accepted the plan, cannot repudiate the condition.

2. Even if it be held that the condition which the Commission attached to its order was beyond its authority, I should still have thought the present case not a proper one for a court of equity to lend its aid to the appellee, and in any event that the decree below should have been so framed as to leave no doubt that the Commission was free to treat the whole order as though it had not been made.

So far as appears, not until appellee filed the present petition did it disclose any purpose to disregard the condition upon which the order depended. In the meantime it had taken full advantage of the benefits of the order. After it was granted, appellee presented to the Commission two supplemental petitions for orders authorizing payments, from the expense fund, of specific amounts for

corporate purposes, not including any item payable out of the $1.50 fund. The first of these was granted. Appellee stated in its first petition:

" The applicant will make such further application or applications, if any, with respect to matters dealt with in the commission's order and not covered hereby as from time to time may be necessary or proper."

The order of the District Court having jurisdiction of the foreclosure directed that deeds of the property should not pass to the appellee until it should have been authorized by the Commission to issue the securities. The appellee, without disclosing any purpose not to comply with the Commission's order, petitioned the District Court for an order directing the delivery of the deeds, exhibiting, the court below found, the order and certificate of the Commission. Upon consideration of this application, the court ordered the delivery of the deeds; and appellee then issued the new securities. Only after the reorganization had thus become an accomplished fact by appellee taking the benefit of so much of the order as suited its purposes, did it elect to repudiate the condition upon which the order was founded. Of the appellee's application to the District Court, the court below rightly said, " The petition was a representation to the court that plaintiff [appellee here] had accepted the order and expected to comply with the condition. . . ."

If appellee were unable or unwilling to comply with the order as made, equity and good conscience required, at least, either disclosure of that fact to the District Court before securing the transfer of the railroad property to it; application, upon full statement of the facts, to the Commission to exercise the jurisdiction, which it had reserved, to approve a modified plan; or prompt initiation of the present proceedings to test the validity of the order before a situation had been created prejudicial to the public interest and to the Commission's performance of its

duties. Instead, appellee adopted a course of conduct consistent throughout only with its apparent purpose to comply with the order; and now, without tendering any excuse for the belated disclosure of its real purpose, it asks relief from the condition only after it has enjoyed benefits which it cannot be said would have been granted without the condition. Neither this Court nor the court below is acting any the less as a court of equity because its powers are invoked to deal with an order of the Interstate Commerce Commission. The failure to conform to those elementary standards of fairness and good conscience which equity may always demand as a condition of its relief to those who seek its aid, seems to require that such aid be withheld from this appellee. See *Davis* v. *Wakelee,* 156 U. S. 680.

3. By the opinion of the Court, the order of the Commission, so far as it approves the issue of the securities, is treated as effective without the condition. But even if we assume that the condition which the Commission attached to the order is beyond its power, we should not attempt to substitute our judgment for that of the Commission, since the statute requires its consent, not ours; and we should not allow the order to stand without the condition, since that is not the order which the Commission made. By the Transportation Act, the giving or withholding of consent to the issue of securities is an administrative power, conferred, not upon the courts, but upon the Interstate Commerce Commission. Courts may determine whether the Commission lacks the power to impose a particular condition; but they may not strike from an order the condition upon which it was granted, and thus declare that it shall stand although the condition is not complied with. See *United States* v. *Louisville & Nashville R. R.,* 235 U. S. 314, 320; *Procter & Gamble Co.* v. *United States,* 225 U. S. 282; *Assigned Car Cases,* 274 U. S. 564.

Whether or not the Commission has in fact consented does not turn on whether the condition is good or bad, but on whether it can fairly be said that the Commission would have given its unqualified consent independently of the condition. As the report of the Commission discloses, consent to the issue was given only with reluctance, to release the properties from the receivership at the earliest possible moment, but with the undoubted assumption on its part as a moving cause for its consent, that by annexing the condition it would exercise control over the reorganization expenses, with respect to the amount of which it had expressed grave concern. With four of the Commissioners voting unconditionally against the issue, I see no sufficient warrant for assuming that any would have voted for it without the condition and without the further investigation which it thought necessary, and which it was authorized to make before unconditionally approving the issue. Both the report and order of the Commission state that the authority granted was upon the " express condition " which is now the subject of this controversy. If in the face of this language there can be any doubt as to the intention of the Commission, we need not speculate upon what it might have done, had it thought it was without power to impose the condition, since it is able to speak for itself if this Court permits it to do so by setting aside the entire order without prejudice to further action by the Commission, under the statute, upon the application for approval of the issue of the securities.

The judgment below, as interpreted by this Court, not only makes effective an order different from any the Commission has granted, but precludes any future action by the Commission in the performance of its statutory duty. In this respect the case differs from those in which this Court has set aside an unconstitutional condition imposed by state legislation on a foreign corporation seeking

to do business within a state. In those cases the judgment of this Court in no way restricts the further exercise of the legislative power of the state in any constitutional manner. Here the Commission is ousted from the exercise of power which Congress has given it, and an order is sanctioned authorizing an issue of securities which it cannot be said the Commission has approved, and which this Court does not purport to say is appropriate under the statute.

MR. JUSTICE HOLMES and MR. JUSTICE BRANDEIS concur in this opinion.