### ATLANTIC COAST LINE R. CO. et al. v. UNITED STATES.
#### No. 278.

District Court, W. D. South Carolina.
March 9, 1931.

F. B. Grier and Carl H. Davis, both of Wilmington, N. C., and M. G. McDonald, of Greenwood, S. C., for plaintiffs.

Elmer B. Collins, Sp. Asst. to Atty. Gen., for the United States.

Daniel W. Knowlton and H. L. Underwood, both of Washington, D. C., for Interstate Commerce Commission.

W. S. O'B. Robinson, Jr., of Charlotte, N. C., for Piedmont & N. Ry. Co.

W. H. Nicholson, of Greenwood, S. C., and Hull, Barrett & Willingham, of Augusta, Ga. (James M. Hull, Jr., George B. Barrett, and J. J. Willingham, all of Augusta, Ga., on the brief), for Georgia & F. R. Co.

Before PARKER and NORTHCOTT, Circuit Judges, and WATKINS, District Judge.

PARKER, Circuit Judge.

This is a suit instituted by the Atlantic Coast Line Railroad Company, the Louisville & Nashville Railroad Company, and the Charleston & Western Carolina Railway Company, against the United States, to enjoin the enforcement of an order of the Interstate Commerce Commission which requires complainants to cancel certain restrictive schedules filed as amendments to joint tariffs theretofore filed with the commission. The commission has intervened in defense of its order, as have also the Piedmont & Northern Railway Company and the Georgia & Florida Railroad, who are interested in maintaining it. These various railroad companies are commonly referred to by the initial letters of their corporate names, and we shall so designate them in this opinion. The effect of the restrictive schedules which have been suspended and ordered canceled by the commission was to deny the benefit of through routes and rates, which had been theretofore established, to shipments passing over the Greenwood extension of the Georgia & Florida between Greenwood, S. C., and Augusta, Ga.

Complainants urge as justification of the restrictive schedules that the Carolina, Clinchfield & Ohio Railroad between Elkhorn, Ky., and Spartanburg, S. C., over which the through traffic in question moves, is operated under a common control with the A. C. L. and the L. & N. within the meaning of section 15 (4) of the Interstate Commerce Act as amended by the Transportation Act of 1920, § 418 (49 USCA § 15 (4) ; that the C. & W. C., which is operated as a part of the A. C. L. system, has a line between Spartanburg, S. C., and Augusta, Ga.; and that to allow the P. & N. between Spartanburg and Greenwood and the G. & F. between Greenwood and Augusta, to participate in the hauling of through traffic passing over the C., C. & O. under the through routes and rates theretofore established is to require complainants without their consent to accept a short haul on such traffic in violation of the provisions of section 15 (4). Defendants contend that complainants cannot invoke the provisions of section 15 (4) because of conditions 3 and 4 imposed by the commission and consented to by the A. C. L. and the L. & N. in their lease of the lines of the C., C. & O., by the terms of which it was stipulated that the line of the C., C. & O. should be maintained as an open route equally available to all connecting carriers. Complainants reply that a proper interpretation of the conditions of the lease does not require that they short haul themselves as to traffic passing over the C., C. & O., and that, if the conditions be so interpreted, it was beyond the power of the commission to impose them.

The through routes and rates in question, 304 in number, were established by joint tariffs in which complainants, the P. & N. and the G. & F. participated, and which were filed prior to the completion of the Greenwood extension of the G. & F. between Greenwood and Augusta. They applied to traffic passing over the C., C. & O. between points at and beyond the Ohio river on the one hand and points in southeastern and Carolina territory on the other. Prior to the completion of the Greenwood extension, the natural course of this traffic between Spartanburg and Augusta was over the line of the C. & W. C. The Greenwood extension was completed and opened to traffic on June 1, 1929; and a route via the P. & N. from Spartanburg to Greenwood and via the G. & F. from Greenwood to Augusta thereupon became automatically available for this through traffic passing over the C., C. & O. under the through routes and rates theretofore established. It

241

was to exclude this route from the provisions of the tariffs establishing the through routes and rates that the restrictive schedules were filed by complainants. The commission, acting under section 15 (7) of the Interstate Commerce Act, as amended by the Transportation Act of 1920, § 418, as amended by Act March 4, 1927, § 2 (49 USCA § 15 (7), suspended the operation of these restrictive schedules, and after hearing ordered that they be canceled as violative of conditions contained in the order authorizing the lease of the C., C. & O. by the A. C. L. and the L. & N. Condition 1 of the order approving the lease required the lessees to maintain a separate organization for operating the leased property. Conditions 3 and 4, which are the ones of particular importance here, are as follows:

"3. So far as lies within the power of the applicants, existing routes and channels of trade and commerce heretofore established by other carriers in connection with the Clinchfield shall be preserved, existing gateways for the interchange of traffic with such other carriers shall be maintained, *and the present neutrality of handling traffic inbound and outbound by the Carolina, Clinchfield & Ohio Railway and its subsidiary, the Carolina, Clinchfield & Ohio Railway of South Carolina, shall be continued so as to permit equal opportunity for service and routing or movement of traffic which is competitive with traffic of the applicants, or either of them,* to and from all connecting lines reached by the line of the Clinchfield companies, without discrimination in service against such competitive traffic.

"4. The applicants shall permit the line of the Clinchfield and its subsidiaries to be used as a link for through traffic, via existing gateways of interchange, or via such gateways as may hereafter be established under authority of the commission by means of the connecting lines which the Louisville & Nashville Railroad Company proposes to build, equally available to such other carriers, now connecting, *or which may hereafter connect,* with the line of the Clinchfield and its subsidiaries, as may desire to participate in through routes and joint rates between points in territory north and west of the line of the Clinchfield and points at and beyond the Ohio River on the one hand and points in the southeastern and Carolina territory on the other, under divisions to be agreed upon by the applicants, or either of them, and/or the Clinchfield organization, on the one hand, and by the other participating carrier or car-

riers on the other, *and shall not discriminate as to rates, fares, and charges against such participating carrier or carriers as compared with the applicants, or either of them; the intention of this provision being that the line of the Clinchfield and its subsidiaries shall be maintained as an open route equally available to all carriers connecting with the Clinchfield for traffic between the points designated."* (Italics ours.)

The A. C. L. owns 51 per cent. of the L. & N. stock and controls its policy. The C. & W. C. is operated as a part of the A. C. L. system. The C., C. & O. is leased to the A. C. L. and L. & N. and is operated by officials appointed by them. It would seem clear, therefore, that the C., C. & O. is operated under a common control with the lines of complainants within the meaning of section 15 (4) of the Interstate Commerce Act as amended by the Transportation Act of 1920, and that complainants would be entitled to the long haul on the traffic in question and to exclude the P. & N. and the G. & F. from participating therein, as they have sought to do by the restrictive schedules, unless they are precluded from so doing by the conditions of the C., C. & O. lease. Two questions arise, therefore: (1) Whether the conditions of the lease require that the line of the C., C. & O. be maintained as an open route for this traffic; and (2) whether these conditions are valid and binding upon complainants. We think that both of these questions must be answered in the affirmative.

It is argued that condition 3 merely requires that the existing neutrality in the handling of traffic over the C., C. & O. be continued so as to preserve equal opportunity for service and routing and movement of traffic competitive with traffic of applicants via existing routes and gateways, without discrimination in service against such competitive traffic; and that condition four merely requires that the line of the C., C. & O. be maintained as an open route for the carriers then directly connecting therewith or, at the most, for carriers which might under the approval of the commission be allowed to make such direct connection thereafter. We think, however, that this gives too narrow and restricted a meaning to the conditions. As thus interpreted, condition 3 would require nothing not already required by sections 3 (3) of the Interstate Commerce Act as amended by the Transportation Act of 1920, § 405 (49 USCA § 3 (3). And, as to condition 4, it certainly could not have been intended to restrict the requirement of neutrality for the benefit

of those roads having direct connection with the C., C. & O. when, as said by the commission, the term "connecting lines" is commonly used "in referring to the lines in general making up a through route." The purpose of the conditions was to withhold from the lessees a partisan control of the C., C. & O. so that its line would remain available on equal terms to their competitors; and we think that this purpose was clearly expressed in the language of the conditions. The plain meaning of that language is that the existing neutrality of the C., C. & O. is to be continued "so as to permit equal opportunity for service *and routing or movement* which is competitive with traffic of applicants" and that the line of the C., C. & O. is to be maintained "as an open route equally available to all carriers connecting with the Clinchfield for traffic between the points designated."

When the lease was before the commission, the L. & N. urged that same be approved to enable it to relieve an intolerable car supply condition on certain of its lines. 90 I. C. C. 118. The A. C. L. put forward the plea that it had no coal on its own rails and desired access over controlled lines to the coal fields of Kentucky and southwestern Virginia. 90 I. C. C. 122. It was urged in addition that the opening of the new route which the lease would make available would enable the L. & N. to get into the Western Carolinas in competition with the Southern and that sundry benefits would accrue to the entire territory affected as a result. 90 I. C. C. 127 and 128. Those opposing the lease, including the G. & F., contended that its approval would destroy certain existing and *potential* routes, withdraw effective competition as to large areas reached by the A. C. L., and give the A. C. L. an undue advantage in transportation in the southeast. The G. & F. objected on the specific ground that it intended to seek permission to build its Greenwood extension, and that, if the A. C. L. were permitted to lease the C., C. & O., this extension would be discriminated against in favor of the C. & W. C. by means of restrictions of joint rates. After considering all of these matters, the commission summed up the situation as follows (90 I. C. C. 131, 132):

"Because of its isolation and the policy of its connections in preferring the longer hauls by more circuitous routes, the Clinchfield is not rendering the service for which it was designed and of which it is capable. The testimony is that its influence on the rate structures of the Carolinas, where its maximum influence should be felt, is practically noth-

ing, and that so long as it continues as an independent property its usefulness to the public will be circumscribed. Control of the Clinchfield by the applicants, when the proposed connections are made between the L. & N. and the Clinchfield, especially the connection with the Harlan County branch, should result in added competition among the coal operators serving the Carolina markets; should give the Carolina territory an additional source of fuel in times of emergency; and should result in added competition with the Southern for traffic between the Carolina territory and the Northwest, at least between the western portion of the Carolinas on the one hand, and Kentucky and points beyond the Ohio River, west of the Cincinnati-Benton Harbor line, on the other. Without some provision, however, for its use by other carriers as a link in through routes, control of the Clinchfield by the applicants would probably result in the abandonment of existing routes, especially the one via Elkhorn City and the Chesapeake; and would doubtless result in placing the Seaboard and other carriers of the Southeast at a disadvantage as compared with the Southern and Coast Line in competing for traffic between the Northwest and certain sections of the Southeast. * * * Those opposing the lease urge that the interest of each of the interveners and of the public in general will be best served if the Clinchfield is maintained as an independent line supported by its connections at each end. They request that any approval of the proposed acquisition be under condition that the Clinchfield be maintained as an open route, neutral or impartial, and equally available to all connections."

The commission then referred to its having sent out notices of proposed conditions of the lease and of having received representations from the interested parties with regard thereto, and announced the conclusion that approval and authorization of the lease would be in the public interest only under five conditions, to 1, 3, and 4 of which we have already referred. With reference to conditions 3 and 4, which are of special importance here, the commission used this very pertinent language (90 I. C. C. 134):

"The applicants have protested vigorously against the imposition of conditions 3 and 4. We have considered fully their representations, however, and have reached the conclusion that without the observance of these conditions by the applicants we are unable to find that the proposed acquisition of control would be in the public interest."

In the light of this record, we think there can be no doubt of the correctness of the conclusion that the line of the C., C. & O. was to be continued as a neutral route and that in a case such as this roads handling through traffic passing over it were to be treated just as though the lease were not in existence and the C., C. & O. were an entirely independent road independently operated. Point is given to this conclusion when it is remembered that the G. & F. was one of the protestants at the time of the approval of the lease, and that one of the "potential" routes which it was sought to save from destruction, and which the conditions of the lease were evidently inserted to save, was the route to be provided by the connection of the Greenwood extension with the P. & N. After the lease was approved, the commission approved the building of the Greenwood extension by the G. & F. at a cost of $3,300,000. And, while we do not think that the A. C. L. is estopped from making its present contention by failing to protest when the G. & F. sought a certificate of public necessity and convenience for the building of this extension, the fact that it did not do so although invited to appear by the commission is a pertinent matter for consideration in determining the meaning of the conditions under which the C., C. & O. lease was approved; for only on the assumption that the extension was to participate in the through traffic passing over the C., C. & O. could the building of the extension be justified as a matter of public necessity and convenience. In authorizing the extension the commission said:

"As an aid in securing better connections for the interchange of traffic it has been planned to extend the line from Augusta in a northerly direction to Greenwood, S. C., a distance of about 56 miles. By this extension connection would be effected with the Seaboard Air Line and the Piedmont & Northern, the latter a strong independent electric line. Through these connections the Georgia & Florida will have direct access to the very important traffic-producing territory of northern South Carolina and central North Carolina, known as the Piedmont district. Through the medium of the Piedmont & Northern it will also have an advantageous connection with the Clinchfield Railroad at Spartanburg, S. C., and through this connection it expects to realize a substantial participation in the tonnage of coal and other commodities moving southbound over the Clinchfield destined to southern Georgia and Florida, and in the northbound movement of freight, principally citrus fruits and vegetables, from southern territory. The lines of the Southern Railway and the Charleston & Western Carolina, the latter a part of the Atlantic Coast Line system, also extend between Greenwood and Spartanburg, connecting with the Clinchfield, but as both of these lines have their own connections to the south the Georgia & Florida must look principally to the Piedmont & Northern for its interchange with the Clinchfield." 117 I. C. C. 473, 475.

We agree with what was said by the commission, in passing the order which we are asked to enjoin, where, in construing the conditions here under consideration, the following language was used:

"The respondents construe the conditions of the Clinchfield lease too narrowly. In authorizing that lease we said in reference to the Georgia & Florida and other opponents of the application—Those opposing the lease urge that the interest of each of the interveners and of the public in general will be best served if the Clinchfield is maintained as an independent line supported by its connections at each end. They request that any approval of the proposed acquisition be under condition that the Clinchfield be maintained as an open route, neutral or impartial, and equally available to all connections. They generally urge that unconditional approval of the application be refused.

"The conditions imposed, and accepted by the Coast Line and the L. & N., were intended to provide in substance for the advantages thus requested, and fairly construed should have that effect. Their purpose was to preserve the relationships then existing between the Clinchfield, on the one hand, and the public and connecting lines of railroad, on the other hand, which were the relationships usually and normally existing between independent railroads and those whom it serves. This purpose is clearly indicated by the language, particularly the closing portion of condition 3, reading: The *present neutrality* of handling traffic inbound and outbound by the Carolina, Clinchfield & Ohio Railway and its subsidiary, the Carolina, Clinchfield & Ohio Railway of South Carolina, shall be continued so as to permit equal opportunity for service and routing or movement of traffic which is competitive with traffic of the applicants, or either of them, to and from *all connecting lines reached by the line of the Clinchfield* companies, without discrimination in service against such competitive traffic.

"And by the corresponding portion of condition 4, reading: The intention of this provision being that the line of the Clinchfield and its subsidiaries shall be maintained as an open route equally available to all carriers *connecting with the Clinchfield for traffic between the points designated.* (The points here referred to are points in territory north of the Ohio and points in southeastern territory.)

"While our immediate concern was to prevent the closing of any gateways and routes then existing, there was no thought of excluding such changes or additions as would further the general purpose. The proposed restriction of routing would not preserve the 'present neutrality' of the Clinchfield, but on the contrary would seriously impair it. There can be no doubt that, as an independent carrier, the Clinchfield would welcome an additional competing route for the movement of its traffic to and from the territory served by the Georgia & Florida, and it is equally apparent that such a route would benefit the Georgia & Florida and the public it serves. There is no warrant for limiting the meaning of 'connecting lines' to the direct connections of the Clinchfield. The term is commonly used in referring to the lines in general making up a through route. There is in fact no other convenient term. The technical nature of this contention of respondents becomes apparent when it is considered that under their construction the conditions would necessarily apply to any extension of operations by the Piedmont, regardless of effect in short hauling the Coast Line." 165 I. C. C. 3, 15.

■■ For the reasons stated, we think there can be no question that the commission was correct in its interpretation of the conditions of the C., C. & O. lease. The question remains as to whether it was within the power of the commission to impose these conditions. We think that it was. Section 5 (2) of the Interstate Commerce Act as amended by the Transportation Act of 1920, § 407 (41 Stat. 481, 49 USCA § 5 (2), provides as follows:

"(2) *Acquisition of control of one carrier by another.* Whenever the commission is of opinion, after hearing, upon application of any carrier or carriers engaged in the transportation of passengers or property subject to this chapter, that the acquisition, to the extent indicated by the commission, by one of such carriers of the control of any other such carrier or carriers either under a lease or by the purchase of stock or in any other manner not involving the consolidation of such carriers into a single system for own-ership and operation, will be in the public interest, the commission shall have authority by order to approve and authorize such acquisition, under such rules and regulations and for such consideration *and on such terms and conditions as shall be found by the commission to be just and reasonable in the premises."* (Last italics ours.)

It will be noted that the commission was authorized, by the section quoted, to approve the acquisition by one carrier of the control of another by lease or otherwise "on such terms and conditions as shall be found by the Commission to be just and reasonable in the premises." It is not only the right but the duty of the commission to impose such conditions as will make the acquisition in the public interest; for, unless the acquisition is found to be in the public interest, the commission cannot authorize it. Chicago Junction Case, 264 U. S. 258, 265, 44 S. Ct. 317, 68 L. Ed. 667. In this case the commission found that the lease would not be in the public interest unless the conditions in question were imposed; and consequently without them the lease could not have been authorized. If they were beyond the power of the commission, it results, not that they are void and the lease unconditional, but that the lease itself is unauthorized. We think, however, that it was clearly within the power of the commission to impose them.

Complainants rely upon the recent decision of the Supreme Court in U. S. v. Chicago, M., St. P. & P. R. Co., 282 U. S. 311, 51 S. Ct. 159, 75 L. Ed. ——. That case, however, is not remotely in point. There the condition imposed related, not to the control of interstate commerce, but to the disposition of a fund subscribed for a special purpose; and it was held that the condition was void because imposed without authority of law, in that it related to a contract which "was not one in respect of commerce but involved a transaction distinct and complete in itself without regard to its results; and, whether succeeded by commerce or not, was no part of it." Here the conditions relate directly to interstate commerce, prescribing how a line of railroad engaged in interstate commerce is to be operated with relation to other interstate carriers, and the manner in which interstate traffic over such line is to be handled. Their effect was to authorize the acquisition of the C., C. & O. by the A. C. L. and the L. & N. in such way as to enable those roads to serve the purposes which they put forward as reasons for the acquisition and at the same time to preserve the independent status of the

C., C. & O. for the benefit of the public and the protection of connecting carriers.

It is argued that as construed by the commission, the conditions in question are violative of section 15 (4) of the Interstate Commerce Act as amended by the Transportation Act of 1920, § 418 (49 USCA § 15 (4), in that they require the A. C. L. and the L. & N., without their consent, to embrace in through routes substantially less than the entire length of their lines and the lines of intermediate roads operated under a common management or control. The answer is that these carriers gave their consent to this when they accepted the C., C. & O. lease, one of the provisos of the order which approved the lease being as follows:

"That the making of said lease and exercise of any of the rights conferred by this order shall in all future proceedings, judicial as well as administrative, to which the carriers above named or any of them may be parties, be deemed and taken as conclusive evidence of their acceptance of, and agreement to abide by, the conditions enumerated in said report, and numbered from 1 to 5, inclusive."

It is argued that the commission was without power to enter the order in question because it is said that the order was in effect the establishment of new and additional through routes without affording a hearing as required by section 15 (3) of the Interstate Commerce Act as amended by the Transportation Act of 1920, § 418 (49 USCA § 15 (3). This point was made before the commission and was sustained as to 33 of the 337 schedules originally involved, on the ground that these 33 schedules related to tariffs to which the G. & F. was not a party. As pointed out by the commission, however, it had jurisdiction as to the remaining 304 restrictive schedules because their purpose was to restrict the joint rates that would automatically become applicable over the Greenwood extension upon its completion without the filing of additional tariffs or further action by the commission. These 304 restrictive schedules, therefore, affected existing rates, fares, and charges applicable on traffic, to, from, or over the G. & F. within the meaning of section 15 (7) of the Interstate Commerce Act as amended by the Transportation Act of 1920, § 418, as amended by Act March 4, 1927, § 2 (49 USCA § 15 (7).

For the reasons stated, we think that the injunction prayed should be denied and that the motion to dismiss the bill of complaint should be allowed.

Bill dismissed.