SAKIS et al. v. UNITED STATES et al.

No. 763–51.

United States District Court
District of Columbia.

Feb. 21, 1952.

Donald S. Caruthers and Albert C. Borghi, Washington, D. C., for plaintiffs.

John J. Donnelly, Jr., Special Asst. to the Atty. Gen. and Vincent A. Gorman, Attorney, Department of Justice, Washington, D. C. (H. G. Morison, Asst. Atty. Gen. and James E. Kilday and Newell A. Clapp, Special Assts. to the Atty. Gen., of counsel), for the United States.

Robert J. Fletcher and Richard Jackson, Boston, Mass., John L. Sullivan, John E. Shea, James G. Boss, and Sullivan, Bernard, Shea & Kenney, all of Washington, D. C., for Boston & M. R. R.

Edward M. Reidy, Associate Chief Counsel, Washington, D. C. (Daniel W. Knowlton, Chief Counsel, Washington, D. C., of counsel), for Interstate Commerce Commission.

John Lord O'Brian, Howard C. Westwood and Covington & Burling, all of Washington, D. C. (Neil Leonard and Bingham, Dana & Gould, all of Boston, Mass., of counsel), for Old Colony Trust Co.

Richard H. Wilmer, John H. Pickering and Wilmer & Broun, all of Washington, D. C. (Moses & Singer, and Cravath, Swaine & Moore, all of New York City, of counsel), for Goldman, Sachs & Co. and L. F. Rothschild & Co.

Henry B. Weaver Jr. and Thomas M. Cooley, II, Washington, D. C., and R. Sturgis Ingersoll, Philadelphia, Pa., for Pennroad Corp.

Mechlin, Marshall & Smith and Sidney V. Smith, Washington, D. C., for Eugene D. Hopper, Ernest E. Swartswelter and Marian M. Swartswelter.

Before CLARK, Circuit Judge, and MORRIS and TAMM, District Judges.

TAMM, District Judge.

*Factual Background.*

This is an action invoking the functions of a statutory three-judge court under Section 2321 of Title 28 of the United States Code to enjoin, suspend, set aside and annul an order of the Interstate Commerce Commission (hereafter called the Commission). The plaintiffs ask also that the Court declare Section 20b of Title 49 of the United States Code Annotated (known as the Mahaffie Act) unconstitutional. The order challenged in this action had its genesis in a proceeding before the Commission entitled Finance Docket No. 16250. The order authorized the Boston and Maine Railroad (hereafter called the Railroad) to put into effect a plan of security modification.

The plaintiffs in this action are Mabel Benson Sakis, an individual, and Mabel Benson Sakis and Byron J. Harrill, a Committee of Stockholders (hereafter called the Committee) representing certain other shareholders. Both the individual plaintiff and the members of the Committee held stock of the Boston and Maine Railroad at the time of the proceedings before the Commission as they do at present. The plaintiffs participated as intervenors in the Commission proceedings and opposed the plan.

The United States appears as party defendant as it is required to do under the provisions of Title 28 of the United States Code, Sections 2321, 2322. The statutory defendant has confessed error as to certain of the allegations made by the plaintiffs. Joined with the United States as a defendant is the Boston and Maine Railroad.

The Commission intervened in this action under the provisions of Title 28 of the United States Code, Section 2323. Other intervenors before the Court were the Old Colony Trust Company of Boston, Mass., the independent depository approved by the Commission to receive and tabulate the assents of shareholders to the security modification plan; L. F. Rothschild & Company; Goldman Sachs & Company; The Pennroad Corporation; and a group of three individual stockholders of the Railroad.

■ The Railroad filed an application with the Commission on August 25, 1948, to modify its security structure under the provisions of Section 20b of the Interstate Commerce Act, 49 U.S.C.A. § 20b. This statutory provision, popularly known as the Mahaffie Act, was enacted April 9, 1948, to relieve the financial distress of railroads that are not in need of reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, or by way of an equity receivership. It provides for a binding plan of modifying a railroad's capital structure when a stated percentage of those stockholders affected approve, with power to bind the dissenters. Before any proceedings were taken with respect to the original application, the Railroad submitted its Supplemental Application No. 1 on January 24, 1949. The Commission entered an order on February 8, 1949, setting the matter for hearing. Pursuant to this order, a hearing was held before an Examiner in Boston during a five-day period commencing March 28, 1949. The plaintiffs before this Court, as well as certain other intervenors, appeared, offered evidence, submitted a brief, and cross-examined witnesses supporting the proposed modification plan. At the hearing, 778 pages of testimony and twenty-seven exhibits were adduced. The Examiner released his proposed report under date of August 17, 1949, and exceptions thereto were filed, all pursuant to statutory authority, by the Railroad, the plaintiffs and certain of the other intervenors. Thereafter, on October 24, 1949, the proceeding was argued before Division 4 of the Commission.

On April 19, 1950, the Commission issued its first report in this case. It approved with some minor changes the plan of security modification submitted by the Railroad. Briefly, this plan calls for a reduction in the number of classes of the Railroad's stock, as well as the aggregate par value of its capital stock; authorizes the issuance of new stock; and cancels dividend arrearages on certain classes of the Railroad's stock. Following this decision of Division 4, certain of the intervenors filed a petition for reconsideration and modification of the report. In response thereto, the entire Commission issued a supplemental report on July 10, 1950. In this report the Commission stated: "Upon consideration of the entire record in this proceeding and of the petitions and reply thereto filed herein, we find that there has been presented no error of fact or law in the report and order by division 4 herein dated April 19, 1950. We further find that no showing has been made warranting reargument or vacation of the order and entry of an order denying the application herein, or modification of the report and order as requested by the petitioners. We further find that the report and order should be affirmed in all respects and that the petitions, except so far as they ask reconsideration, should be denied."

Thereafter, the plaintiffs, on July 14, 1950, filed objections to the material proposed to be sent to stockholders of the Railroad in connection with the solicitation of assents under the Plan. Division 4 ruled that the objections were not timely. Petitions were then filed for hearing and review by the full Commission of the action of Division 4. The Commission denied the petitions on August 15, 1950.

The Railroad conducted its campaign to solicit assents; and on December 15, 1950, by appropriate publication, announced the end of the submission period upon the ground that sufficient assents had been received to comply with the requirements laid down by Division 4 in the order of April 19, 1950. Thereupon, the Railroad filed Supplemental Applications Nos. 2 and 3 (December 27, 1950) which sought a final order permitting the consummation of the plan. The plaintiffs filed a reply to these supplemental applications, raising certain questions which the Commission discussed in its third report and order issued January 23, 1951. The Commission in this report found that the Railroad had obtained the required number of assents to the plan and authorized the Railroad to execute the plan.

On February 20, 1951, the plaintiffs filed a further petition with the Commission on behalf of a committee of stockholders for reopening of the proceeding. The Commission on the next day, February 21, 1951, denied this petition. That same day, the

plaintiffs filed in this court a complaint challenging the proceedings before and order of the Commission and obtained a restraining order from this court, which order stayed the Commission's final order placing the plan in operation.

Subsequently, on February 28, 1951, the plaintiffs filed a supplemental and amended complaint alleging that the Commission's order was invalid because: (1) of some procedural errors in the Commission proceedings which constituted arbitrary and unlawful conduct on the part of the Commission; (2) there was no evidence in the record before the Commission to support certain of its findings, and (3) Section 20b of the Interstate Commerce Act is unconstitutional and void.

The pleadings in this case have raised many and varied questions of law. Of necessity, the Court's opinion is a longer one. The several challenges of the plaintiffs to the order of the Commission will be considered individually.

*Classes of Stock.*

The Mahaffie Act, under which the modification plan was proposed and considered, requires: "If the Commission shall find that as a result of such submission the proposed alteration or modification has been assented to by the holders of at least 75 per centum of the aggregate principal amount or number of shares outstanding of each class of securities affected thereby (or in any case where 75 per centum thereof is held by fewer than twenty-five holders, such larger percentage, if any, as the Commission may determine to be just and reasonable and in the public interest), the Commission shall enter an order approving and authorizing the proposed alteration or modification upon the terms and conditions and with the amendments, if any, so determined to be just and reasonable." 49 U.S. C.A. § 20b (2) (d).

It thus appears that the Commission must determine how many classes of securities are involved in a carrier's capital structure. The Commission found that the Railroad had, for the purpose of this proceeding, four classes of stock. The plaintiffs contend that this finding is unsupported by the record. They argued before the Commission and the Court that there were at least eight or as many as fifteen classes of stock.

The four classes of stock to which the Commission ordered the proposed plan submitted were: prior preference, first preferred, preferred (non-cumulative) and common.

The Court addresses itself first to the contention of the plaintiffs that the five series of first preferred stock constitute distinct classes of stock. Some reference to the history of this stock is essential to a discussion and consideration of its nature. In 1919, the Railroad underwent a reorganization. At that time, the present preferred stock was issued on a share-for-share exchange basis for stocks of the Railroad's then major lessor lines. Each series of this stock bore a dividend rate equal to the rate theretofore guaranteed by the Railroad on the stocks of lessor lines. Thus, the five series of first preferred stock bear different dividend rates, and each series now has accumulated different amounts of unpaid dividends on a per share basis. The consolidation agreement of November 26, 1918, under which the 1919 reorganization was effected, provided that the original issued capital stock of the reorganized corporation, consisting of 814,728 shares of the par value of $100 each "shall be divided into classes having different rights and preferences and bearing different rates of dividend," and designated those "classes" as first preferred, Class A, Class B, Class C, Class D, Class E, as well as the non-cumulative preferred and the common stocks, and in the provisions relating to dividends referred to the "different classes of first preferred stock." It was also provided that, *"No class of first preferred stock shall have any preference or priority over any other class"* of such stock. (Emphasis supplied).

Holders of this first preferred stock are entitled to any distribution of dividends after payment of the prior-preference dividend and before any such distribution is made on non-cumulative preferred or common stock. If dividends declared payable on the first preferred stock are less than the amount necessary to satisfy the full dividend requirements of that class, the sev-

eral series thereof share *ratably* in the dividend distribution. In case of liquidation, holders are entitled to receive all their accrued and unpaid dividends before any payment may be made to holders of the non-cumulative preferred and common stocks on account of the par value thereof, but thereafter, the remaining assets of the corporation shall be distributed equally among the holders of first preferred, non-cumulative preferred and common stocks.

This partial priority in liquidation, as provided in the agreement of consolidation, dated November 26, 1918, pursuant to which this series of stock was issued, was modified by a stock readjustment agreement in 1926, whereby those holders of first preferred stock who assented to the stock readjustment plan were given priority in liquidation over the assenting holders of non-cumulative preferred and common stocks for the par value of the stock plus the accrued and unpaid dividends not surrendered or assigned under the 1926 agreement.

Although there were statements made by certain of the Railroad's officers to the effect that there were eight classes of stock, the testimony of the Railroad's officers and witnesses before the Commission generally was to the effect that there are four classes of stock. The Court is not unmindful of the fact that such testimony would facilitate the Railroad's obtaining the required percentage of assents.

The statute as set forth above does not define the word "classes". It appears from the Commission's reports that a test employed by the Commission in determining whether the various series of first preferred stock constituted distinct classes was borrowed from Section 77 of the Bankruptcy Act. By Sub. c(7) of that section, the reorganization court is specifically directed to determine "the division of creditors and stockholders into classes according to the nature of their respective claims and interests." That statute also provides that "such division shall not provide for separate classification unless there be substantial differences in priorities, claims, or interests." Under the provisions of Sub. e, such classification forms the basis for submission of the approved plan to creditors and shareholders for acceptance or rejection. Although recognizing that a modification proceeding under Section 20b of the Interstate Commerce Act was substantially different from a proceeding under Section 77 of the Bankruptcy Act, the Commission utilized the criteria of Section 77 as an aid in determining what constitutes a "class" of stock.

■ The Commission examined the character and composition of the various series of first preferred stock and determined that there was no "substantial difference in priorities, claims, or interests" so as to have them constitute more than one class of stock. Considering the testimony before the Commission and the significant facts concerning the contractual rights of the holders of first preferred stock, the Court believes that the finding of the Commission was proper.

It is further contended by the plaintiffs that in determining the number of classes of stock the Commission erred in not treating the stamped and unstamped securities of the Railroad as constituting distinct classes. All classes of the Railroad's stock, except prior preference, appear in the market as stamped or unstamped to reflect the fact that the holder or his predecessor either agreed or did not agree to the Railroad's stock readjustment plan in 1926. That plan, pursuant to which the prior preference stock was issued, provided for the assent of holders of first preferred stock to the surrender and assignment to the Railroad of their rights to receive and be paid certain cumulative dividends accruing after July 1, 1920; and, in consideration thereof, such assenting stockholders were granted a certain priority in liquidation. The non-assenting shareholders of this class were paid their accumulated dividends in cash. Consummation of the plan also called for assent of holders of non-cumulative preferred and common stocks. Thus, it came about that there were stamped and unstamped stocks, respectively, for the first preferred, A, B, C, D, and E, the non-cumulative preferred and the common.

The plaintiffs argue that this situation results in fifteen classes of stock, composed

of two each (stamped and unstamped) for five classes of first preferred, the non-cumulative preferred and the common, in addition to one class for the prior preference.

The record discloses that the difference in rights, which the plaintiffs urge is the determinative factor, between the stamped and unstamped stock lies only in the amount of their liquidation claims. Since this is not a liquidation proceeding, the amounts of liquidation claims did not constitute a factor in the Commission's method of evaluating the several classes of existing stock for the purpose of determining the proper basis of allocation of the new stock issues. Witnesses for the Railroad before the Commission expressed the opinion that, so far as value is concerned, any distinction between the stamped and the unstamped stocks has long since disappeared and that the provision is now worthless. Concurrence in this view was expressed by two of the Railroad's directors who were called as witnesses for the plaintiffs, it being their conclusion that so far as value is concerned any differential had been wiped out several years ago during the depression and that such provisions are now valueless. Stock-market quotations on these securities covering the years 1929 to 1948 were considered by the Commission. They indicated that during the years 1939–1948, when the market prices of the Railroad's securities were quite low, any distinction in market value between the stamped and unstamped securities had practically disappeared.

■ In its report dated April 19, 1950, the Commission stated: "On the basis of all the evidence, we find that any distinction in rights and privileges between the stamped and the unstamped stocks lies only in the amount of their liquidation claims, is not of such a character as to give rise to any substantial differences in priorities, claims or interests, and therefore does not justify the creation of separate classifications for the purposes of this proceeding."

This conclusion of the Commission appears to the Court to be warranted by the record.

*Sufficiency of Evidence.*

Section 20b of Title 49, United States Code Annotated, requires that the Commission make findings that a plan of security alteration or modification is just and reasonable, is in the best interest of the carrier, of each class of stockholder, and is in the public interest. In their complaint, the plaintiffs allege that there is no evidence in the record to support the Commission's finding that the Railroad's plan meets the statutory test.

■ With respect to the contention that the plan is not in the best interest of the *carrier* and the *public,* the plaintiffs rely on evidence before the Commission to the effect that the Railroad is, at present, in the best physical and financial condition of its 119 year history; that there is no danger of rights of the Railroad's creditors being impaired and that the approval of the plan would in no way improve the service rendered by the Railroad to the public. Essentially, the position of the plaintiffs is that the security modification plan is *unnecessary.* It is not the understanding of the Court that the Commission must find that the plan is *necessary,* but rather that it is in the best interest of the carrier and the public.

The Congress in enacting section 20b declared it to be in aid of the transportation policy as set forth in the preamble of the Interstate Commerce Act, among other things, "to enhance the marketability of railroad securities impaired by large and continuing accumulations of * * * dividends on preferred stock * * *."

One of the ends to be accomplished through enhancing the marketability of such securities is "to promote the public interest in increased stability of values of railroad securities with resulting greater confidence therein of investors."

The record has been examined. It reveals that the Commission considered evidence that the capital stock structure of the Railroad was exceedingly cumbersome and complicated [1]; that considerable dividend arrearages had accumulated on certain

1. Record, I. C. C. Finance Docket No. 16250, pp. 29–30.

302

classes of stock[2]; and that there was little hope that the situation would be alleviated without a reorganization[3]; that there was a great necessity for reconstituting the stock structure if the Railroad was to continue to furnish efficient service[4]; that approval of the plan would improve the credit position of the Railroad[5]; and would probably enable the Railroad to resume paying dividends[6]. Several witnesses who possessed an intimate knowledge of the Railroad testified as to the desirability of the plan. The plaintiffs and other intervenors were heard in opposition to the plan. They presented arguments in support of their position, submitted exhibits and advanced alternate plans for relieving the financial distress of the Railroad.

■ It is the duty of this Court to determine whether there is sufficient evidence in the Commission's record to justify its findings. That being done, our work is completed.

"The credibility of witnesses and weight of evidence are for the Commission and not for the courts, and its findings will not be reviewed here if supported by evidence." Merchants Warehouse Co. v. United States, 283 U.S. 501, 508, 51 S.Ct. 505, 508, 75 L. Ed. 1227. "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 54 S.Ct. 692, 694, 78 L.Ed. 1260. "The findings of the Commission are made by law prima facie true. This court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience. * * * And, in any special case of conflicting evidence, a probative force must be attributed to the findings of the Commission, which, in addition to 'knowledge of conditions, of environment, and of transportation rela-

tions,' has had the witnesses before it and has been able to judge of them and their manner of testifying." Illinois Central R. Co. v. Interstate Commerce Commission, 206 U.S. 441, 454, 27 S.Ct. 700, 704, 51 L. Ed. 1128.

■ The question is not whether this Court, upon a consideration of the record that the Commission had before it, would make the same findings as the Commission; the question rather is, Was there rational basis for the finding that the Commission did make? Rochester Telephone Corp. v. United States, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147; Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260.

■ Applying the principles above cited, it appears that there was ample evidence in the record to support the Commission's findings that the plan was in the best interest of the Railroad and the public.

The argument of the plaintiffs in opposition to the finding of the Commission that the plan is in the best interest of *each class of shareholders* is that the plan is manifestly inequitable. In reassigning equity interests, the plaintiffs contend that under the modification plan the prior preference stockholders were favored to the detriment of the members of the junior classes.

The Court is of the opinion that in determining what values and interests were to be assigned to each class of stockholders under the plan, the Commission proceeded along traditionally approved lines. The first step taken was to establish what the total capitalization should be. That was done by relying largely on the earnings record of the Railroad from 1927 to 1947. The Supreme Court has said that this is proper in Ecker v. Western Pacific R. Corp., 318 U.S. 448, 482–483, 507, 63 S.Ct. 692, 87 L. Ed. 892; Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific

2. Record, I. C. C. Finance Docket No. 16250, pp. 161–163.

3. Record, I. C. C. Finance Docket No. 16250, pp. 42–44.

4. Record, I. C. C. Finance Docket No. 16250, p. 334.

5. Record, I. C. C. Finance Docket No. 16250, p. 334.

6. Record, I. C. C. Finance Docket No. 16250, pp. 72–75.

R. Corp., 318 U.S. 523, 539–541, 63 S.Ct. 727, 87 L.Ed 959, and Reconstruction Finance Corp. v. Denver & Rio Grande Western Corp., 328 U.S. 495, 517, 66 S.Ct. 1282, 1384, 90 L.Ed. 1400. In allocating to the classes of shareholders their proportionate share of the new total capitalization, the Commission endeavored to calculate what would take place in the future if the present capital structure were to remain in effect and then to translate the relative values so developed for the several classes of outstanding stock into the proposed new capitalization; that is, to determine the relative claims of the several classes to future earnings. This standard has been approved by the Supreme Court in Otis & Company v. Securities and Exchange Commission, 323 U.S. 624, 65 S.Ct. 483, 89 L.Ed. 511, and Securities and Exchange Commission v. Central-Illinois Securities Corp., 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836.

■ The allocation of new stock to the various classes of stockholders appears to be based upon approved methods and standards of readjustment programs and to be entirely reasonable.[7] The Court notes that the prior preference stockholders will receive a great deal more shares of stock than they hold now.[8] However, this class of stock through its claims and arrearages owns most of the equity of the corporation at present; the allocation seems only to reflect this fact. The prior preferred stockholders are surrendering part of their preferred position, all of their accumulated dividends and their right to have dividends accumulate in the future unless they are earned in exchange for their newly enlarged percentage of the new stock. The prior preferred shareholders will also receive a much larger share of voting control. There was considerable and persuasive testimony before the Commission on the desirability of having those who actually own the controlling equities of a corporation, also, through voting rights, control its affairs. The Court cannot say that the Commission's finding in this regard is in any way unreasonable.

The first preferred stockholders will receive under the plan slightly less stock than they now hold. Their proportion of the voting power remains almost exactly the same. The first preferred stockholders surrender completely their preferred position ahead of the two junior classes. They also surrender their accumulated dividends. They gain, however, the probability of

---

7. The Court has read the recent statement of Mr. Justice Frankfurter in his opinion in connection with the denial of the petition for a writ of certiorari in Bondholders, Inc., v. Powell, Jr., Receiver, 72 S.Ct. 319. Although Justice Frankfurther there questions valuations based on future earnings, the Court is of the opinion that, in the light of the Supreme Court cases on which it relies, the conduct of the Commission was proper.

| 8. Present stock | Present shares | New securities per share | | New Preferred | New Common |
|---|---|---|---|---|---|
| Prior preference | 229,414 | 1.2 | shs. new pfd. | 275,296.80 | |
| | | 1 | sh. new com. | | 229,414 |
| First preferred | | | | | |
| A | 188,341 | .65 | sh. new com. | | 122,421.65 |
| B | 76,488 | .85 | sh. new com. | | 65,014.80 |
| C | 79,115 | .79 | sh. new com. | | 62,500.85 |
| D | 43,239 | 1.05 | shs. new com. | | 45,400.95 |
| E | 650 | .60 | sh. new com. | | 390.00 |
| | 387,833 | | | | 295,728.25 |
| Preferred | 31,498 | .07 | sh. new com. | | 2,204.86 |
| Common | 394,728 | .05 | sh. new com. | | 19,736.40 |
| | 1,043,473 | | | 275,296.80 | 547,083.51 |
| | | | | Total shares: | 822,380.31 |

sharing immediately in a dividend distribution.[9]

The non-cumulative preferred and common stockholders give up a large part of their voting powers. It also appears from the record that, in the exchange the market value of the securities held by the common stockholders will be reduced.[10] These shareholders, as well, gain the probability of sharing in the earnings of the Railroad forthwith.

The Commission, in approving the plan, considered also the fact that the last dividend the Railroad paid on any class of stock was in 1932 when it paid a dividend only on prior preference stock. It would appear from the record that one of the primary objectives of the plan is to enable the owners of the Railroad to participate in its earnings through payment of dividends. Under the proposed plan, dividends are probably forthcoming to all stockholders within the immediate future.

The following statement by the Commission in its report dated July 10, 1950, appears to the Court to be accurate: "Certainly there was an extensive presentation of the case and the intervenors fully availed themselves of their right to cross examine the applicant's (Railroad's) witnesses with respect to both fact and theory involved in the proposed plan of modification."

Plaintiffs disagree with the conclusions drawn by the Commission from the evidence. But, as stated by the Court in Re Electric Bond & Share Co., D.C., 95 F. Supp. 492, 498, when a similar argument was made with respect to conclusions drawn by the Securities and Exchange Commission concerning a plan of simplification: "This is merely a quarrel with the Commission's judgment which is not subject to review."

There is sufficient evidence in the record to support the Commission's finding that the plan is in the best interest of each class of the Railroad's stockholders.

*Rate of Capitalization.*

The next challenge of the plaintiffs to be considered is that the Commission erred in permitting the Railroad to construct its permissible capitalization under the plan by capitalizing historical average gross earnings at a rate of five per cent. The plaintiffs assert that a capitalization of the Railroad's earnings at the rate of five per cent. is clearly erroneous for the reason that railroads in general and the Boston & Maine in particular have not earned five per cent. on their invested capital for many years. (The average rate of return, after depreciation and amortization, of class I railroads for the twenty-year period 1928–1947, was 3.359 per cent. The Boston & Maine's historical rate of return is approximately 3.5 per cent.).

In view of the very extensive investigation by the Commission of every element or factor having any bearing on the question of future earning capacity, including the physical condition of the Railroad, and their examination of the past earnings record, it cannot be said that the Commission acted arbitrarily. The Commission emphasized, in approving the five per cent. rate, that the Railroad's revenues and income "have shown a downward trend during the year 1949, this being a projection of a situation which has prevailed more or less since the war years * * *". The Commission further stated, "that the income estimate presented by its witnesses is at least

9. On the basis of evidence before the Commission, dividends under the Railroad's present capital structure would not be paid on any class of stock for a considerable period of time. It was estimated that it would take seventeen years to discharge the arrearages on the prior preferred so that holders of first preferred stock would not receive dividends for seventeen years; that it would take fifty-seven additional years to pay off the accumulations on the first preferred and that dividends would not be available for holders of the non-cumulative preferred and common stock for seventy-four years.

10. The market price quotations of the common stock at the time of the hearings before the Commission were a high of $2.37 and a low of $1.62. It has been estimated that one share of the new common stock, which will be issued in exchange for twenty shares of the old common, will have a market price of around $18.

on the optimistic side. Moreover, while * * * the final figure is a matter of informed judgment, logical support for a normal future income appreciably less than $9,000,000 could be found in a study of the applicant's twenty-two year record, as hereinbefore demonstrated. From this standpoint, capitalization of that figure at a rate of five per cent. might be regarded as excessive; certainly in combination with such estimated income, that rate does not produce an unreasonably low capitalization in this case."

In a bankruptcy proceeding, the Court of Appeals for the Seventh Circuit answered a debtor's objection to the Commission's reduction in the debtor capitalization by saying: "In so arguing, it seems to us that the debtor overlooks the point that any determination of total capitalization by the Commission is in itself a valuation, which, concededly, is not subject to review." Chicago, Rock Island & Pacific R. Co. v. Fleming, 157 F.2d 241, 245.

▮▮▮▮ The Court must repose confidence in the expert judgment of the Commission on matters of valuation. The rate of capitalization in this case does not appear to be arbitrary; the Court holds that it was proper.

### Solicitation of Assents.

Several of plaintiffs' challenges to the orders of the Commission are concerned with the manner in which the Railroad was permitted to solicit assents to the plan. The first of these is that the Commission arbitrarily and contrary to law allowed the Railroad to solicit assents by telephone and personal contact with its stockholders.

The Mahaffie Act provides (at Sub-section 2): "All letters, circulars, advertisements, and other communications, and all financial and statistical statements, or summaries thereof, to be used in soliciting the assents or the opposition of such holders shall, before being so used, be submitted to the Commission for its approval as to correctness and sufficiency of the material facts stated therein." 49 U.S.C.A. § 20b(2) (d).

The order of submission of the Commission, dated April 19, 1950, provides that:

"Solicitation may be carried on by personal interview, mail, advertisement, telephone or telegraph."

▮▮▮▮ In objecting to the provision of the Interstate Commerce Commission's order, the plaintiffs argue that the expression, "and other communications", of the statute includes oral communication. With this contention, the Court does not agree. The words preceding this phrase all define written communication. It does not appear unreasonable, therefore, that the phrase, "and other communications", likewise refers to written communications. The true meaning of the word, communication, of course, is not limited to written communication. In the context of this statute, the Court is of the opinion that it is so restricted. The Court is not unmindful of the danger of improper oral solicitation. There is a safeguard against this danger, however, in the written material which is approved by the Commission according to the provisions of the statute and sent to the stockholders. If doubt is created in the mind of a stockholder by some oral communication as to the true nature of a proposed plan of security modification, reference may be had to this approved written material.

Of necessity, a certain amount of oral communication is vitally important. The percentage of assents of each class of stock required by the Mahaffie Act is high. It would no doubt be difficult, if not impossible, to ever obtain the required percentage of assents if oral communications were not permitted.

The written material used by the Railroad in soliciting assents is challenged by the plaintiffs as well. They contend that the Commission permitted the Railroad to use material which did not make a fair and proper disclosure of the proposed plan.

The record reveals that the solicitation material was composed of (a) a letter to shareholders from the president of the Railroad, (b) the reports and orders of the Commission dated April 19, 1950 and July 10, 1950, (c) a condensed statement of income of the Railroad for the years 1938–1949 and the first five months of 1950, (d) the latest available balance sheets, (e) a statement of the provisions of the plan of

security modification and (f) the form letters of assent. All of the material had received the approval of the Commission as to its correctness and sufficiency.

 Except for the president's letter and the form letter of assent, the documents consisted of the Commission's reports in the proceeding and figures reflecting the Railroad's financial condition—figures prepared in accordance with the Commission's classification of accounts. It does not appear that counsel for the plaintiffs raised any objection to the form letter of assent. The president's letter largely embodied statements and opinions which had in substance been adopted by the Commission in its reports. The contention that the material approved by the Commission to be used in soliciting assents did not make a fair and proper disclosure of the proposed plan appears to the Court to be without merit.

At the hearing of this case, the plaintiffs alleged that the financial statement of the Railroad covering the first five months of 1950 was never approved by the Commission. The short answer to this objection is that the record reveals that it was. The statement was incorporated with the letter of the president and approved as such.

The complaint of the plaintiff alleges that the Commission "arbitrarily and contrary to law denied the Committee's request that the Railroad be directed to include in the material submitted to the stockholders pertinent and proper information concerning the plan." The record reveals that substantially all the matter which the plaintiffs sought to have disseminated was in fact included in the material approved by the Commission and referred to above. As pointed out hereafter, the plaintiffs had a right to submit material approved by the Commission to the Railroad's shareholders.

The final objection of the plaintiffs on the question of solicitation of assents is that the Commission did not set a limit on the expense which the Railroad might incur in hiring agents, brokers and employees to obtain shareholders' assents.

 The Commission's order of April 19, 1950, provided: "That the directors, officers, and regular employees of the applicant may take part in soliciting assents, and the applicant may retain the services of one or more firms or persons specializing in such work to assist in the solicitation; that reasonable provision may be made for the compensation of such firms or person * * *".

The plaintiffs have cited no authority to support their position that the Commission in this regard has acted arbitrarily or contrary to law. There is no provision in the Mahaffie Act which requires the Commission to set the maximum limits of permissible expense. The Court has referred to the fact that oral solicitation was contemplated by the statute because of the difficulty that would otherwise be encountered in obtaining the required percentage of assents. Those who do this work on behalf of the Railroad are entitled to reasonable compensation. A report was made to the Commission of the total compensation paid by the Railroad. It was approved by the Commission. The Commission, vested by statute with discretion to decide the manner in which solicitation is to be conducted, acted properly in authorizing the Railroad to incur reasonable expenses in soliciting assents.

*Termination of Solicitation Period.*

The plaintiffs allege that the Commission erred in failing to rule that the period for the solicitation of assents ended on November 19, 1950. They base their argument on the wording of the order of the Commission of April 19, 1950. That order provided for an effective date thirty days from the date of the order and that the Railroad was given six months from the effective date (i. e., until November 19, 1950) within which to obtain assents unless an extension were granted. The plaintiffs filed a petition for reconsideration of this order of April 19, 1950. No formal extension was granted, and the Railroad did not obtain the required assents until December 14, 1950.

The Court believes that Section 17(8) of the Interstate Commerce Act, 49 U.S.C.A. § 17(8) disposes of this contention. It provides (so far as pertinent here): "Where application for * * * reconsideration

of a decision * * * of a division * * * is made * * * and the decision * * * has not yet become effective, the decision * * * shall be stayed or postponed pending disposition of the matter by the Commission * * *."

The report and order of the Commission dated July 10, 1950, states: "The filing of the petitions (of the plaintiffs) stayed the operation of the Order and postponed its effective date pending their disposition."

█ Accordingly, July 10, 1950, (the date of the Commission's order upon reconsideration of the proceeding), was the postponed effective date of the order of April 19, 1950; and the submission period was to close six months from that date—or on January 10, 1951. From this it will be observed that the assents were received well within the six month's period permitted by the Commission.

*Burden of Proof.*

█ It was alleged in the plaintiffs' complaint that the Commission "arbitrarily and contrary to law placed on the Committee the burden of disproving that the Railroad's plan of security modification was fair and reasonable in all respects and was in the best interest of the public and of each class of the Boston & Maine's shareholders." This question was not discussed in the plaintiffs' trial brief and, at the hearing of this case, counsel for the plaintiff merely repeated the allegation. The record discloses that this contention is completely without merit.

*Inspection of Assents.*

A more substantial attack on the Commission's order is found in the plaintiffs' allegation that the Commission exceeded its statutory authority in denying the plaintiffs a hearing on the question of whether the percentage of assents required by its order of April 19, 1950, was in fact obtained.

The Mahaffie Act provides: "If the Commission shall find that as a result of such submission the proposed alteration or modification has been assented to by the holders of at least 75 per centum of the aggregate principal amount or number of shares outstanding of each class of securities affected thereby * * * the Commission shall enter an order approving and authorizing the proposed alteration or modification * * * ." 49 U.S.C.A. § 20b(2)(d).

On December 29, 1950, the Railroad in filing its Supplemental Applications Nos. 2 and 3, advised the Commission that the necessary assents to the plan of security modification had been obtained as of December 14, 1950, and submitted to the Commission affidavits verifying this statement signed by the vice-president of the Old Colony Trust Company and the vice-president of the Railroad.

On December 31, 1950, plaintiffs filed with the Commission a request that the plaintiffs be granted thirty days within which to file objections to Supplemental Applications Nos. 2 and 3. The only reason given for this request was that the Railroad had refused to furnish the plaintiffs with a list of stockholders in response to their request dated December 7, 1950. It will be noted that this was, in effect, no reason at all. The Commission's order of April 19, 1950, provided: "That the applicant shall supply to any holder of stock of any class of affected securities, or to a duly authorized representative of such holder, upon request, or make available to such holder or representative, under conditions reasonably convenient to their use, a current list of the names and addresses of the holders of record of such stock, or, in the alternative, if it so elects, the applicant shall mail, at the request and expense of such holder, copies of any material, the correctness and sufficiency of which have been approved by us, proposed to be used by such holder in connection with the solicitation of assents or dissents to the plan of alteration and modification."

In denying the plaintiffs' request for a list of stockholders, the Railroad offered to mail to its stockholders any approved material which the Committee wished to submit. It does not appear that the plaintiffs accepted this offer.

Later, on December 29, 1950, after the period of solicitation had been closed, the plaintiffs requested of the Railroad that the original assents and revocations of assents, a list of shareholders and certain other in-

formation be made available to the Committee. The Railroad on January 3, 1951, by a letter to the Commission, indirectly denied the plaintiffs' request of December 29, 1950.

By letter dated January 3, 1951, the plaintiffs were advised by the Commission that their request for thirty days within which to file objections to the Railroad's supplemental applications would be denied and that their objections should be filed within the ten-day period prescribed by the Commission's rules.

On January 8, 1951, the plaintiffs filed a reply to the Railroad's supplemental applications and formally requested that the Commission order the Railroad to make available to the plaintiffs for inspection the original assents and revocations being held by the Railroad and the depository. They argued to the Commission then, as they do before this Court now, that it was improper for the Commission to make its finding that the required number of assents had been obtained solely on the basis of the affidavits of officers of the Railroad and the Old Colony Trust Company.

By order of January 23, 1951, the Commission denied the plaintiffs' petition and directed the Railroad to put the plan into effect thirty days thereafter.

On February 20, 1951, the plaintiffs filed a petition with the Commission to reopen the case for the introduction of new evidence, for reconsideration of its order of January 23, 1951, for oral hearing and for a stay of the effective date of the order of January 23, 1951. The Commission denied this petition February 21, 1951. The plaintiffs stated in this petition: "Congress intended that the Commission would make a finding of fact that the necessary assents to the plan had been secured only upon the best evidence, and not upon affidavits which cannot be cross-examined by interested parties. The fact that the applicant refused to permit the intervenors to inspect the original assents and revocations, or to make available a list of stockholders, created an inference that warranted a demand for the best evidence. The Committee, upon information and belief, believes that undue influence was exercised by persons soliciting assents and that a thorough inquiry into the representations made by soliciting through telephone and personal contact, might reveal that the necessary assents were not freely given to support the plan."

The Court first considers the question of whether it was improper for the Commission to find that the required assents had been obtained on the basis of the Railroad's and Old Colony Trust's affidavits alone. If the only affidavit before the Commission were the Railroad's, the Court would have serious doubts as to the propriety of the Commission's finding. Such an affidavit would tend to be self-serving and quite reasonably open to question. This situation is not before the Court, however. As has been seen, the Commission acted on the basis of affidavits of both the Railroad *and* the Old Colony Trust Company. In its order of April 19, 1950, the Commission authorized the procedure to be followed in determining the number of assenting shareholders. As has been noted, the plaintiffs filed exceptions to this order. None of these exceptions, however, made the slightest reference to the procedure adopted by the Commission or the employment of the Old Colony Trust as the independent depository.

Old Colony had acted as the Railroad's transfer agent. It had complete records of the Railroad's shareholders and was unquestionably well qualified to serve as depository of the shareholders' assents. The Commission's selection of this depository, particularly in view of the fact that it went unchallenged by the plaintiffs, appears to the Court to have been a reasonable one. That depository having reported to the Commission that the required number of assents had been received, and no substantial charge that this affidavait was incorrect or untrue having been made, was the Commission authorized by the statute to find that a sufficient number of shareholders had approved the plan? The Court is of the opinion that it was. To hold otherwise would, in effect, make the work of the depository a nullity. If the Commission were required to independently examine the assents and revocations received by the appointed depository when it has no reason

to suspect that the depository did not perform its function properly, a wasteful and unnecessary burden would be imposed on it.

The Court turns now to the question of whether the plaintiffs were entitled to a hearing on the question of the number and validity of assents to the plan. The plaintiff has cited many cases to the Court on the requirement of an adequate hearing before an administrative body. See: L. B. Wilson Co., Inc., v. Federal Communications Commission, 83 U.S.App.D.C. 176, 170 F.2d 793; Interstate Commerce Commission v. Louisville & Nashville R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431; Texas & Pacific Motor Transport Co. v. United States, D.C., 87 F.Supp. 107; United States v. Chicago, Milwaukee, Saint Paul & Pacific R. Co., 282 U.S. 311, 51 S.Ct. 159, 75 L.Ed. 359; Southern Stevedoring Co. v. Voris, 5 Cir., 190 F.2d 275. The Court does not believe that any of these decisions control the question to be decided. The cases cited by the plaintiff stand for the proposition that: " * * * A full hearing is one in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety, from the standpoint of justice and law, of the step asked to be taken. * * *" Akron, C. & Y. R. Co. v. United States (The New England Divisions Case) 261 U.S. 184, 200, 43 S.Ct. 270, 277, 67 L.Ed. 605.

Now, the "step to be taken" in this case is that a plan of security modification be approved by the Commission for submission to the stockholders of the Railroad. The record reveals that a full hearing was given to the plaintiffs on this question. The Court has already observed that the procedure for tabulating assents and notification to the Commission that the required number of assents had been obtained went unchallenged by the plaintiffs in noting their exceptions to the Commission's order of April 19, 1950. The statute provides that the Commission shall find that the required number of assents had been obtained. It does not expressly require a hearing before making this finding, nor does the Court believe that one was intended. Section 20b(2) of the Interstate Commerce Act sets out those matters which will be determined only after a hearing. It will be noted that the question of the number of assents is not among them.

The plaintiffs argue that, despite the fact that the Mahaffie Act does not require a hearing to support the Commission's finding here, the Administrative Procedure Act, 5 U.S.C.A. § 1001, et seq., does. The Court does not agree with this contention.

The introductory language of Section 5 of the Administrative Procedure Act provides: "In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved * * * (3) proceedings in which decisions rest solely on inspections, tests, or elections * * *."

As indicated above, the Mahaffie Act requires a hearing only on certain questions; it does not require a hearing on the question of the validity and number of assents. Hence, the determination by the Commission that the required percentage of assents has been obtained would not seem to be "an adjudication required by the statute to be determined on the record after opportunity for an agency hearing." For this reason, it appears to the Court that the Administrative Procedure Act does not govern this question.

But a further reason may be advanced. The provisions of Section 5 do not apply to "proceedings in which decisions rest solely on inspections, tests, or elections". One of the most significant and important elements of an election, of course, is the tabulation of the voting. Since Section 5 does not impose the requirement of a hearing where votes are to be counted, it does not appear to the Court that the Administrative Procedure Act requires a hearing on the tabulation of assents in this case.

The Court does not have before it the question of whether the Commission would have been required to grant the plaintiffs' petition of February 20, 1951, for a hearing if the plaintiffs had alleged any substantial

misconduct on the part of the depository and of the Railroad. A section of this petition is set out above. The Committee merely expressed its belief that the Railroad's solicitors had acted improperly and that an inquiry "might reveal that the necessary assents were not freely given to support the plan." This Court believes that the language of the Commission in denying the petition of the plaintiffs of January 8, 1951, is equally sound when applied to the petition of February 20, 1951. The Commission stated: "To grant the intervenors' request that they be given an opportunity to make an individual investigation and inspection such as they suggest obviously would result in substantial further delay. In the complete absence of any evidence, or even any allegation that any irregularities occurred in the conduct of the submission, or that any errors or irregularities occurred in the certifying of the results of the submission, we must conclude that there is no justification for thus delaying the consummation of this proceeding. On the basis of the record, we find that the intervenors' request should be denied."

■ Had the plaintiffs presented any tangible evidence of fraud or error in connection with these affidavits, which they did not, or had they alleged any specific fraud or irregularity in their petition to the Commission, which they did not, and had the Commission then declined a hearing on this question, the Court's position on this point might well be the reverse of its present ruling. The Court cannot overlook the fact that plaintiffs had some five months to conduct investigations, contact stockholders or send Commission approved literature to the stockholders, but failed to take any affirmative action prior to December 7, 1950.

*Constitutionality of Mahaffie Act.*

The plaintiffs attack the constitutionality of the Mahaffie Act on several grounds. The first of these, as stated in the plaintiffs' brief, is that "Congress failed to prescribe the proper standards by which the Commission is to administer the Act", and consequently, Congress "unlawfully delegated to the Commission the legislative power of Congress in contravention of Article I, Section 1, of the Constitution of the United States." This general challenge appears to be directed to a failure of the Act itself to define the phrase "class of securities", used in Sub-section 2 of the Act and to establish standards to be used by the Commission in determining the rights of the senior and junior shareholders in the distribution of the new securities.

With respect to the phrase, "class of securities", the plaintiffs have argued that it is not a term of art but a generic term. They point to the fact that Congress has given the Commission nothing as a guide by which the Commission could determine what is a "class of securities". The phrase, according to the plaintiffs, is so ambiguous as not to define an ascertainable standard.

■ The Court does not agree with this contention. The Supreme Court has stated: "The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding." Sproles v. Binford, 286 U.S. 374, 393, 52 S.Ct. 581, 587, 76 L.Ed. 1167.

The Commission has been dealing for many years with classes of stock, issuance of securities and reorganization of Railroads. It does not seem unreasonable that Congress in charging this body to determine the number of classes of stock of a carrier did not elaborate on that phrase. As the Court has noted previously, the Commission in reaching its determination on this question borrowed the well-recognized test of Section 77 of the Bankruptcy Act: Is there a substantial difference in the rights, priorities and interests of the various security holders?

■ Turning to the contention of the plaintiffs that Congress failed to prescribe standards for the Commission to follow in determining the rights of the senior and junior stockholders in the distribution of new securities, the Court, in rejecting this contention, relies principally on the provi-

sions of the statute setting forth the criteria governing the Commission.[11]

Of necessity, the statute could not spell out with more particularity the method by which the Commission will reach its determination as to how many new securities will be issued to each stockholder. The existing capital structure, as well as the proposed, peculiar to each carrier, will necessarily result in different arrangements on the issuance of securities. The Court has already indicated that the procedure followed by the Commission in determining the amount of the Railroad's new total capitalization and the allocation of new securities to the various classes of stockholders have been approved by the Supreme Court. (See discussion under heading, "Sufficiency of evidence").

Further challenges to the constitutionality of the Mahaffie Act are based on the Due Process clause of the Fifth Amendment to the Constitution. The plaintiffs allege that under the provisions of the Act, parties in their position are deprived of property without due process of law in that:

1. they are denied a hearing on the question of whether the required number of assents to the plan have been obtained, and

2. seventy-five per cent. of each class of stockholders are given the power to deprive twenty-five per cent. of their contract rights with the Railroad corporation.

The first of the above contentions will be dealt with briefly since the Court has already extensively considered the propriety of the Commission's denial of the plaintiffs' petition to hold a hearing on the validity and number of assents filed with the depository. The Court has previously observed that the plaintiffs had a full hearing on the merits of the plan and the method of submission to the stockholders. The statute does not require a hearing on the question of the Commission's finding that the required percentage of assents had been obtained, nor does due process. In the complete absence of any specific charge of fraud or irregularity, the Commission's finding was an administrative task of a purely mechanical or clerical nature. The Court is of the opinion that due process does not require that this finding be based on a hearing unless it affirmatively appears that there is some substantial or tangible charge that an irregularity exists.

The Court turns now to the contention of the plaintiffs that they have been deprived of property without due process of law in that under the Act, seventy-five per cent. of the holders of each class of securities can deprive them of their contract rights with the Railroad corporation.

Congress is the proper branch of the government to declare policy and, having found a danger existing, to design the legislative machinery to avoid or repel the danger. In enacting the Mahaffie Act,

11. Sub-section 2 of Section 20(a) of the Interstate Commerce Act provides: "The commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose."

Sub-section 2 of Section 20(b) of the Interstate Commerce Act provides: "If the Commission, after hearing, in addition to making (in any case where such alteration or modification involves an is-suance of securities) the findings required by paragraph (2) of section 20a of this title, not inconsistent with paragraph (1) of this section shall find that, subject to such terms and conditions and with such amendments as it shall determine to be just and reasonable, the proposed alteration or modification—(a) is within the scope of paragraph (1) of this section; (b) will be in the public interest; (c) will be in the best interests of the carrier, of each class of its stockholders, and of the holders of each class of its obligations affected by such modification or alteration; and (d) will not be adverse to the interests of any creditor of the carrier not affected by such modification or alteration * * *."

Congress defined the danger and designed appropriate machinery to obviate it. If contract rights stand in the way of the exercise by Congress of a power within its competence under the Constitution, the contract right must fall. Support for this position is found in Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885. The fact that the contract rights are held against a corporation in the terms of corporate securities is of no consequence, as has been established in cases decided under the Public Utility Holding Company Act, 15 U.S.C.A. § 27. As the Court said in American Power & Light Co. v. Securities & Exchange Commission, 329 U.S. 90, 67 S.Ct. 133, 143, 91 L.Ed. 103: "Section 11(b)(2), like § 11(b)(1), materially affects many property interests of holding companies and their investors; it may even destroy whatever right there is to continued corporate existence on the part of a holding company that is found to complicate a system unnecessarily and to serve no useful function. But Congress carefully considered these various interests and found them 'outweighed by the political and general economic desirability of breaking up concentrations of financial power in the utility field too big to be effectively regulated in the interest of either the consumer or the investor and too big to permit the functioning of democratic institutions.' It is not our function to reweigh these diverse factors or to question the conclusion reached by Congress * * *." See also: North American Co. v. Securities and Exchange Commission, 327 U.S. 686, 66 S.Ct. 785, 90 L.Ed. 945, and Securities and Exchange Commission v. Central-Illinois Securities Corp., 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836.

Legislation of the character represented by Section 20b is designed to modify or alter contract rights—not capriciously, but in order that the relationship between the security holder and his fellows, and between the security holder and the corporation, may be stated in terms of present day realities rather than in terms that are so remote from reality as to be misleading. The Court's language in Schwabacher v. United States, 334 U.S. 182, 68 S.Ct. 958, 967, 92 L.Ed. 1305 (which deals with the situation of altering the contract rights of security holders pursuant to a merger), is appropriate on this point: "Apart from meeting the test of the public interest, the merger terms, as to stockholders, must be found to be just and reasonable. These terms would be largely meaningless to the stockholders if their interests were ultimately to be settled by reference to provisions of corporate charters and of state laws. Such charters and laws usually have been drawn on assumptions that time and experience have unsettled. Public regulation is not obliged and we cannot lightly assume it is intended to restore values, even if promised by charter terms, if they have already been lost through the operation of economic forces. Cf. Market St. Ry. Co. v. Railroad Commission, 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171. In appraising a stockholder's position in a merger as to justice and reasonableness, it is not the promise that a charter made to him but the current worth of that promise that governs, it is not what he once put into a constituent company but what value he is contributing to the merger that is to be made good."

■ The Commission, having regard for the Congressional policy expressed in the Mahaffie Act, found after extensive investigation that the plan was just and reasonable as to all classes of the Railroad's shareholders. It appears to the Court, from the cases cited, that a denial of due process does not arise from the fact that the dissenting stockholders will be deprived of certain contract rights.

■ In their complaint, the plaintiffs further alleged that the Mahaffie Act was unconstitutional in that it:

"1. Is an unlawful extension of the power delegated to Congress by Article I, Section 8, Clause 3, of the Constitution of the United States.

"2. Is an unlawful exercise of judicial power contravening Article III, Section 1, of the Constitution of the United States.

"3. Is an unlawful exercise of powers reserved to the States by Amendment X to the Constitution of the United States."

At the hearing of this case, counsel for the plaintiffs did not argue in support of these three grounds of constitutional attack, nor are they referred to in the plaintiffs' brief. The Court is of the opinion, however, that these allegations are not so patently meritorious as to justify the Court in upholding them upon the basis of the record before it.

*Expenses of the Plaintiffs.*

The Commission in its order of April 19, 1950, denied the Committee's request for an order requiring the Railroad to pay the Committee's expenses and attorneys' fees incurred in opposing the plan. This is challenged by the plaintiffs. The Commission in denying the plaintiffs' request relied on its prior decision in Lehigh Valley R. Co. Securities Modification, 271 I.C.C. 655, 657-8. In that decision, the Commission emphasized the fact that in those proceedings where an administrative body ordered the payment of participant's expenses it was expressly authorized to do so by statute. Under Section 20b of the Interstate Commerce Act, no provision is made for the Commission to authorize or direct payment by the Railroad of compensation or reimbursement of expenses of parties to the proceeding. Accordingly, the Court finds no error in the Commission's denial of the plaintiffs' request that it order the Railroad to pay their expenses.

The department of Justice under the statutory requirement that the Attorney General represent the United States in this type of case filed an answer to the original complaint on April 27, 1951. Later, on November 2, 1951, the Department of Justice filed an amended answer in which it supported the constitutionality of the Mahaffie Act but challenged certain of the findings, rulings and conclusion of the Interstate Commerce Commission in approving the modification plan. The Justice Department also supported certain of the plaintiffs' contentions concerning lack of due process in the proceedings before the Commission. The Court has treated those aspects of the case wherein the Justice Department supported the plaintiffs in its discussion of the various points raised by the plaintiffs.

In support of its pleading which, in effect, confesses error on the part of the Commission, however, the Justice Department has as a result of an extensive investigation obtained a number of affidavits and depositions which were filed with the Court in support of the efforts of the plaintiffs and the Justice Department to overthrow the Commission's ruling in favor of the modification plan. The Court does not question the right of the Attorney General to take a position adverse to the Commission. Henderson v. United States, 339 U.S. 816, 70 S.Ct. 843, 94 L.Ed. 1302. The Court upon motion of the Railroad, the Commission and various intervenors declined to consider the additional evidence tendered by the Justice Department because this evidence was never presented to the Interstate Commerce Commission. The Court ruled that the present case requires the Court to review the ruling of the Commission in the light of the evidence which was before the Commission. This Court does not believe that this proceeding is de novo in character and construes the Court's function and responsibility to be exclusively that of reviewing the case upon the basis of the record actually before the Interstate Commerce Commission at the time that the Commission made the ruling. The Court did not in reaching its conclusions in this case consider the evidence tendered by the Justice Department because, as indicated, it was conceded that the Commission had no knowledge of the facts alleged by the affidavits and depositions obtained by the Justice Department.

The affidavits and depositions submitted by the Justice Department as a result of its investigation after the issuance of the temporary restraining order by this Court contain serious charges of irregularity and fraud on the part of the Railroad, its officers, agents and employees in the obtaining of assents to the modification plan and of the depository, the Old Colony Trust Co. These documents offer evidence which if credible and true charge that a grave and serious fraud has been perpetrated upon the Interstate Commerce Commission. If the facts alleged in these doc-

uments were established by competent evidence and were not explained and dissolved by other competent evidence, the gravity of the perpetrated fraud would shock the conscience of a Court or Commission. This Court does not believe, however, that it is the function of a statutory three-judge court to take and weigh evidence of this kind at this stage of this type case. The Court believes that the Commission is the proper forum to sift, hear, evaluate and act upon the matters charged by the Justice Department. There is no reason for the Court to feel that the Commission will not give consideration to an appropriate motion filed by the plaintiffs upon the basis of the documents tendered by the Justice Department which, in effect, constitute a claim of new evidence before the Commission.

For the reasons set forth above, the Court affirms the orders of the Interstate Commerce Commission entered in this proceeding and dissolves the restraining order issued by the Court staying the effective date of the Commission's order of January 23, 1951.